I. FINDINGS OF FACT
A. THE PARTIES
1. The plaintiff, Elisabeth F.S. Solomon ("Solomon") is the founder and former Executive Director, Planning Director, Trustee and Treasurer of Hall-Brooke Foundation, Inc. ("Hall-Brooke"). She currently resides at 47 Long Lots Road, Westport, Connecticut. [Revised Complaint No. 83-213998, 2; Amended Answer 2.][1]
2. Hall-Brooke is a charitable corporation which operates a psychiatric hospital and a special education school and engages in public education and consulting activities. Its principal place of business is at 47 Long Lots Road, Westport, Connecticut. [Revised Complaint No. 83-213998 3; Amended Answer 3.]
3. Solomon is also Hall-Brooke's landlord. She owns the twenty five acre parcel of real estate and the buildings in which Hall-Brooke operates. Hall-Brooke leases this property from Solomon pursuant to a 50 year lease. [Ex. 38.]
4. The individual defendants in Case No. 83-229056 are certain past and present Trustees of Hall-Brooke, as well as Hall-Brooke's Executive Director, Rosalie Aberman, and its outside counsel, David Levett.[2]
B. SOLOMON'S "RESCISSION" AND "MISMANAGEMENT" CLAIMS[3]
Solomon's Purchase of Hall-Brooke
5. On September 18, 1964, Solomon and a friend named Irving H. Cooper (through their corporations Delmon, Inc. and IHC Corporation) purchased Hall-Brooke Hospital, including approximately 27 acres of real estate and buildings, for a total of $907,000. The purchase price included $150,000 for a two acre parcel and the prior owners' private residence, which were sold off almost immediately. Thus, the price paid for the 25 acre property that became the actual Hall-Brooke Foundation was $757,000. [[Tr. 218, 231, 246, 250, 1774; Ex. 602.] This purchase was almost entirely financed by two mortgages, which were secured not only by the real estate but also by all the personalty, fixtures and equipment — down to the potato peelers and CT Page 1522 toasters. [Tr. 1775-7, 1837-8; Ex. 604 and 605.]
6. The prior owners of Hall-Brooke had leased the Hospital property to an operating corporation known as Hall-Brooke Hospital, Inc. for an annual rental of $30,000. [Tr. 1779-1781; Ex. 600.] On the day that Solomon and Cooper purchased Hall-Brooke, they caused their real estate holding company, Delmon, Inc., to enter into a lease with IHC Corporation, the corporation that was to run the actual hospital business, whereunder Delmon leased the Hall-Brooke premises to the IHC Corporation for $136,000 — over $100,000 more than the prior rent. [Ex. 5; Tr. 1781-1783.] This lease (later assigned to the new Hall-Brooke Foundation[4] was a "net lease," yielding $136,000 to the landlord "absolutely net" of "all costs, expenses and obligations of every kind and nature," all of which would be paid by the tenant. [Ex. 5; Tr. 1786-91.]
7. After the purchase of Hall-Brooke Hospital, Solomon became its administrator and Cooper was the Executive Director. [Tr. 252.] Although Solomon alleges in essence that she was solely responsible for the Hospital's success, Hall-Brooke was by the time of Solomon's purchase a fully accredited, licensed hospital with a good program and a good reputation in the psychiatric community. [Tr. 215.] It had a full complement of professional staff and other personnel, all of whom remained at Hall-Brooke Hospital after the purchase [Tr. 227, 246, 253, 335] and it also had a "medical advisory board" of prominent outside psychiatrists who consulted to Hall-Brooke staff and served as a liaison with local referring psychiatrists. [Tr. 241-243.] Further, by the time that Solomon bought Hall-Brooke, the Hospital had already begun to develop a new approach to psychiatric treatment known as the "therapeutic community" approach, whose premise is that the entire hospital community plays a part in the patient's therapy. This treatment was further developed in the years after Solomon acquired Hall-Brooke. [Tr. 255-256, 332-334.]
8. For about two years, Solomon ran Hall-Brooke as a for-profit corporation. [Tr. 1800.] During this period, Hall-Brooke was not, apparently, a particularly lucrative operation. For example, in the first full year of operations under the Solomon/Cooper management, assets exceeded liabilities by only $3,000, and all of IHC's officers and employees (including Solomon and Cooper) were paid a total of $41,728 in salary. [Ex. 481, 607, Tr. 1857-68.]
9. At some point before July 1966, Cooper and two outside investors dropped out of the picture. [Tr. 286-7, 1801, 1871.] By July 1, 1966, Solomon owned and controlled all of the Hall-Brooke property and business. [Tr. 1802-3.]
Hall-Brooke Becomes a Non-Profit Institution
10. Some time before December 1965, a number of factors caused CT Page 1523 Solomon to consider turning Hall-Brooke into a non-profit corporation. There was, in the first place, pressure from Hall-Brooke doctors to join the majority of non-profit health care institutions. Additionally, Solomon recognized that non-profit status would enhance Hall-Brooke's opportunities, as well as her own career. As a non-profit institution, Hall-Brooke stood a better chance of getting government and foundation grants of money, and would of course qualify for tax exempt donations — both sources of money that would not be available to Hall-Brooke as a for-profit entity. Non-profit health care institutions seemed to enjoy a better reputation among health care professionals, and therefore Solomon thought that Hall-Brooke's ability to recruit more and better doctors and other personnel would be enhanced. Non-profit status would also enable Hall-Brooke to affiliate with other non-profit organizations, which in turn would help to enhance Hall-Brooke's reputation. Finally, as a non-profit corporation, Hall-Brooke would not have to pay federal income tax, state or local taxes or sales tax, all of which would free up more cash flow which could be used in the operation of the institution. In short, Solomon concluded that from an organizational, financial and developmental point of view, there were tremendous advantages to being non-profit. [Tr. 257-8, 1804-8, 1815-18, 1822; Ex. 16.]
11. Solomon understood that one of the prices the government exacts for granting all of these benefits of non-profit status, is that any surplus money left in the corporation after all reasonable expenses may not "inure" to the benefit of any private individual, but must be devoted solely to the purposes and functions of the charity and for the public good — with the administrator limited to payment of salary. Further, Solomon recognized that once she set up a non-profit Foundation, it would go on forever, and would not be dependent on any one person's life or ownership but would be governed by a self-perpetuating Board of Trustees. As a non-profit foundation, the Board of Trustees would have the right, power and responsibility to run the organization, and her role would be simply that of an employee. Indeed, Solomon testified repeatedly that she understood that once Hall-Brooke became a charity, she personally could no longer control its operations but rather, control would be transferred to the Trustees, who would be obligated to act in what they believed to be in the best interest of the charity — and not necessarily Solomon's interest. [Tr. 1810, 1813-15, 1825, 1885, 1907, 1977-78, 2934; Ex. 16.]
12. Solomon did not go into the non-profit arena in ignorance. She received legal and accounting advice, as well as advice from various professionals in the health care and non-profit areas. [Tr. 260-62, 278-285]. On December 5, 1965, Hall-Brooke was incorporated as a charitable foundation. The incorporators were Solomon, her personal attorney Daniel Meister, and another attorney, John Boyd, who was also retained by Solomon but was to serve as Hall-Brooke's counsel. [Tr. 289; Ex. 12.] The Certificate of Incorporation CT Page 1524 provided, among other things, that upon dissolution of the corporation all of its assets "shall" be distributed to another charitable organization: and that the corporation's affairs shall be conducted by a Board of Trustees. [Ex. 12.]
13. On July 1, 1966, the date of the foundation's creation, Solomon wrote a letter to her personal attorney, Daniel Meister, in which she asked him to protect her interests and also to help her set up the non-profit organization in accordance with governing laws. Solomon's "outline" of the proposed project included an employment contract for herself to retirement age, and a lifetime appointment to Hall-Brooke's Board of Trustees. [Tr. 411-414, Ex. 17.] She also requested that in the event "formalities, state, federal and local authorities either delay or cancel these plans. . . or rescind non-profit status, I receive everything back as prior to foundation." [Ex. 17, 7.] Solomon concedes that this request reflected only her concern that regulatory authorities might not permit the Foundation to go forward in the first instance. [Tr. 1905, 3681.] It does not express a continuing long-term condition, which would have thwarted charitable status and would have been inconsistent with Hall-Brooke's Certificate of Incorporation, which required that in the event of Hall-Brooke's dissolution all funds and assets of the corporation must be distributed to another charitable organization. [Ex. 12, 5.] In any event, no such long-term condition is found in any of the operative documents creating the Foundation. (See infra.)
14. Solomon testified that it was important for her to tell her attorney that her employment contract was an important factor, and that she would not have agreed to give Hall-Brooke away without that. [Tr. 416-418.] The letter to Meister does not say that, however, and in any case there was no evidence that Solomon ever shared the contents of this letter with Hall-Brooke, or indeed with anyone other than her own personal attorney. She further testified that she told Boyd of her desires to lead the new institution. (Tr. 292.[5])
15. The organizational meeting of Hall-Brooke was held on July 1, 1966. [Ex. 18.] It was attended by Solomon, Meister and Boyd; of these, only Boyd had no prior or ongoing professional relationship with Solomon. [Tr. 1887.] At that meeting, the following pertinent actions were taken:
a. By-laws drafted by Mr. Boyd were adopted [Ex. 14]. Contrary to Solomon's letter to Meister, these by-laws did not provide that Solomon would be a lifetime trustee, nor was she elected or appointed a lifetime trustee at the inception of the foundation. (Indeed, Solomon did not become a "sustaining" or lifetime trustee for almost three years — see infra.) Also contrary to Solomon's letter, no provision was made in the by-laws (or elsewhere) for reversion of the Hall-Brooke assets to Solomon in the event of the Foundation's dissolution. CT Page 1525
b. Solomon was elected President, Treasurer, Director, and Chairman of the Board.
c. The participants at the meeting ratified and approved an agreement between the Foundation and IHC Corporation, vesting in the Foundation the operation of the hospital and transferring to the Foundation all rights, duties, obligations and contracts of IHC, including the 1964 lease (which was assigned to Hall-Brooke that day.) [Ex. 6, 7; see also Tr. 1872-9.]
d. Meister and Boyd adopted an employment contract between the Foundation and Solomon as Executive Director. [Ex. 9.]
16. Solomon's July 1, 1966 employment contract provided for her employment as Hall-Brooke's Executive Director (its chief executive officer) until age 65 or retirement, whichever occurs sooner, to render services to the Foundation under the directors of the Foundation, at an annual salary of $35,000, to be "increased proportionately with any increases in salary given to the highest medical staff members of Hall-Brooke Hospital." It provided that the
 "Foundation may terminate this agreement if Solomon has been adjudicated in a criminal court of competent jurisdiction as guilty of theft, fraud or embezzlement regarding the assets of the foundation or regarding her employment." [Ex. 9.]
17. Solomon's employment contract was drafted and presented to the Board by her attorney, Daniel Meister. [Tr. 1919, 1966-67.] Solomon testified that she understood it to mean that despite the fact that the Board of Trustees was vested with the obligation and power to run the Foundation, under this contract she could not be terminated for 31 years unless she was convicted of a crime involving theft, fraud or embezzlement from the Foundation, no matter how much the Trustees disagreed and no matter how incompetent she might be. [Tr. 1974-75; 1981-83.]
18. Solomon claims that as a condition for and in consideration of her transfer of ownership and control of the IHC Corporation to Hall-Brooke, the "Foundation, in writing, expressly promised [her] continual and permanent supervisory and visitorial participation in the Foundation" (a) by the terms of her employment contract; and (b) by her election as Chairman of Hall-Brooke's Board and, in 1976, her election as life-time trustee. [Revised Complaint No. 229056 13. See also Tr. 3682-84, 3688, 3716-18.] However, none of the written documentation underlying the creation of Hall-Brooke supports Solomon's claim of an express written promise conditioning Solomon's creation of the Foundation on either her employment contract or her lifetime trustee status. [See Ex. 12, 9, 6, 7, 11, 8, 14, 15.] Nor is there any reference in the "founding" documents to Solomon's claimed CT Page 1526 entitlement to be a lifetime trustee of Hall-Brooke. Rather, several of the "founding" documents contradict the notion of linkage between Solomon's employment or trusteeship and the creation of the non-profit entity. For example, as has been noted, both Hall-Brooke's initial Certificate of Incorporation [Ex. 12] and By-laws [Ex. 14, Art. 1 6] provide that the Foundation's affairs are to be conducted by a Board of Trustees, and the By-laws specify that trustees are to have three year terms of office (Article 1, 1). The By-laws also specify that the Board is to "select and employ" a competent and experienced executive who would administer the hospital subject to the Board's policies and orders (Article V, 1), without any indication that this person had to be Solomon.
19. Shortly after the organizational meeting of Hall-Brooke, Solomon filed for tax exempt status for the Foundation — an essential component of her plan. [Ex. 19; Tr. 1984-87.] The instructions to the tax exemption application outlined the pertinent requirements of the Internal Revenue Code, including the requirement that a tax exempt organization must be
 "irrevocably dedicated to an exempt purpose so that in the event of its dissolution, the assets will be distributed only for an exempt purpose"
and included questions about the relationship between Hall-Brooke and various individuals. In response, Solomon disclosed Hall-Brooke's plans to compensate the creator of the organization (herself) for services; she represented that no part of the Foundation's income would "inure" to the benefit of any individual; and she supplied copies of her employment contract, the lease between herself and Hall-Brooke, and the Foundation's by-laws and charter. [Ex. 19, Tr. 1997.] Nowhere did she indicate that the creation of Hall-Brooke was conditioned on her long-term employment or permanent trusteeship.
20. In response to the IRS' request for additional information, Solomon subsequently supplied a statement "setting out in detail" the contributions she made to Hall-Brooke, stating in full:
"Contributions by Elisabeth Solomon:
 (a) $5,000 in cash and personal endorsement of secured liabilities;
 (b) Absolute assignment of hospital operating lease and absolute transfer of assets;
 (c) Waiver of all rights to profit and dedication of all profits to Foundation purposes;
(d) Gave option to Foundation to acquire real estate thus CT Page 1527 limiting right of alienation;
 (e) Payment of all legal fees for personal representation and drafting of documents of transfer to Foundation." [Ex. 19A, 4 (emphasis added).]
Solomon testified that when she told the IRS she made an "absolute" assignment and transfer that was true, [Tr. 2005, 2008.]
21. In another section of her supplemental response to the IRS, Solomon acknowledged:
 "Elisabeth Solomon performs same duties as she did for predecessor on a full time basis. Her prior proprietary interest has now been transferred to the Board of Trustees of the Foundation." [Ex. 19a, 16 emphasis added.]
Again, there is no mention of any condition, qualification or restriction of Solomon's transfer of her proprietary interest to Hall-Brooke's Board of Trustees.
22. Some months later, the IRS having told Hall-Brooke that it viewed Solomon's salary and rent as too high, Solomon wrote attorney John Boyd a letter conveying her view that both streams of income were justified. This handwritten letter also undercuts Solomon's present claim that her "gift" to Hall-Brooke was a conditional one. It includes the following statements:
 "I work for this salary and I have given away all my rights and my heirs' rights to the business. . . All of this is being devoted to the public. . .
 When you asked on behalf of the Foundation for all provisions to protect and to give to the Foundation, I agreed with full knowledge of what I was doing. . ." [Ex. 27, emphasis added.]
23. The IRS initially rejected Hall-Brooke's application for tax exempt status, finding that the salary and rent paid to Solomon were excessive, and that therefore Hall-Brooke was not operated exclusively for tax exempt purposes because part of its earnings "inured" to Solomon's benefit. [Ex. 28.] Eventually, however, Hall-Brooke and the IRS reached a negotiated settlement, whereunder Solomon's salary was to be reduced to $30,000 in lieu of $35,000, and the rent was to be reduced from $136,000 to $110,000. [Ex. 30; Tr. 2058-62.] Subject to these terms, the IRS granted Hall-Brooke's tax exemption. [Ex. 31.][6]
Thereafter, Hall-Brooke has been eligible for and has received tax deductible charitable donations. [Id.; Ex. 1016-18; 1035-7.]
24. On May 27, 1969 — almost three years after Hall-Brooke's CT Page 1528 inception as a non-profit organization — Hall-Brooke's by-laws were amended to provide for a "sustaining member" of the Board of Trustees, with a term until "such member desires to resign or becomes otherwise unqualified." This amendment was unanimously approved by the Board of Trustees and Solomon was elected to be the "sustaining member" [Ex. 39], a term later changed to "lifetime trustee." [Tr. 536-7, 796-7, 4967-9.]
Solomon's Subsequent Admissions About the Circumstances of Her Gift
25. In the years after Solomon's initial creation of the Foundation, Solomon made a number of statements (some under oath) which belie her present claim that the Foundation's creation was conditioned upon her employment contract and life-time trusteeship. Those statements are discussed in chronological order:
a. The 1972 Board meeting
Many of the Hall-Brooke Board of Trustees meetings in the mid 1970's were either tape recorded or transcribed. A transcript of a Board meeting in September, 1972 reveals that several of the Trustees had been unaware of Solomon's employment contract and were concerned about the restrictions it imposed on the Board. [Ex. 611c, pp. 65-75.] In response, Solomon did not then assert her claim that her contract was an indefeasible condition of the Foundation's existence, as she now maintains. To the contrary, she asserted (falsely) that the term of her contract had been modified and was no longer to age 65. [Id., p. 69.] Further, she acknowledged that the Board had the right and obligation to decide whether she should remain in Hall-Brooke's employ, stating adamantly
 "If the Board decides it doesn't want my services it, of course, makes a different decision. . . No contract is valid unless both parties adopt it and agree to honor it. If this Board feels that this contract. . . is appropriate [sic] to go on with this organization, then we'd better talk about that. . . if this Board gets hung up on the issue that it is not a regular board because it has a long-term contract. . . with one of its employees, then I would say that we are really in a terrible spot because my opinion is there isn't such a contract that can continue to be valid if it impedes the organization from what it's supposed to be doing. . . . Yes, this Board will always be controlled by me if this board will not take on its responsibilities as a board. . . Of course you can fire me." [Ex. 611c, p. 72-75, emphasis added.]
b. The CHHC Hearings
In 1975, Solomon gave sworn testimony before the Commission CT Page 1529 on Hospitals and Health Care ("CHHC") at hearings relating to Hall-Brooke's first application for a rate increase. [See C.G.S. 19a-145a et seq.; Tr. 569-570, 2162-3.] Among other things, the CHHC wanted to determine whether Solomon, who was both Hall-Brooke's landlord and its chief executive officer, was a "related" entity for rate making purposes. In essence, the issue was whether Hall-Brooke Hospital was so controlled by Solomon that the rent and other payments to her might not be legitimate arms-length expenses properly included in Hall-Brooke's rates. [Tr. 578-80, 591-592, 3803-4, 3823-4.] In the course of its inquiry, the CHHC (not unlike the IRS some years before) focused on the fairness of the rent payments to Solomon as well as Solomon's employment contract, and questioned Solomon about the nature of her creation of the Foundation. In response to the CHHC's questions as to the transaction in which Solomon contributed her holdings in IHC to Hall-Brooke, Solomon testified:
 "I owned the real property as well as the business itself. . .And when I contributed it to the foundation I contributed everything in the operating corporation which of course included numerous assets as well as the good will, as well as licenses, and all benefits accrued to my business at that time and whatever the value the business had, all of it went into the foundation with no further claim from me." [Ex. 623A, pp. 29-30, emphasis added.]
Further, when questioned about the relationship between Solomon's transfer of the business and her contractual relationship with Hall-Brooke, Solomon insisted that the two were not related. She stated:
 "[F]irst it definitely was a contribution. I wanted to set up the foundation and I enlisted a lot of people's help to try to organize and produce such a new corporation that would provide the non-profit community service organization that we now have. Once that was established then the issue, of course, has come up as to where would I continue to work, or wouldn't I continue to work, which of course, was then properly negotiated. And the result of that would be this employment contract.
 Now, I did have a choice not to have any further employment with the foundation or with the new organization. It was not a preexisting condition or anything like that. It was a definite agreement that for my work I would be getting paid, and I will be working for the foundation, and there is an employment contract on that basis." [Ex. 623A, pp. 31-32, emphasis added.]
Solomon also testified that she did not take any tax deduction for her contribution because she wished not to establish "any question or doubt as to the "out-right gift" that she had made. [Ex. 623C, p. CT Page 1530 19-20.] Further, she testified that her employment contract had a termination clause, and that "if the Board feels that they want to fire me I am absolutely sure they will find a way to fire me." [Ex. 623C, p. 27-28, 49.] Solomon did not inform the CHHC, at this or any time, of her present claim that her lifetime employment contract was not terminable except for embezzlement and was a condition to her formation of Hall-Brooke.
c. The Levett Memorandum
A few months after Solomon testified before the CHHC, Hall-Brooke's general counsel, David Levett ("Levett") of Cummings Lockwood, prepared a proposed presentation intended to persuade the CHHC that Solomon and Hall-Brooke were not "related." In forwarding his draft presentation to Solomon for her review, Levett cautioned
 "As you know, I have prepared this summary without reviewing the underlying factual information and it would be extremely embarrassing to [Hall-Brooke's special counsel] Jack Zeldes to make any factual claims that we could not support with certainty. Accordingly, I would appreciate your reviewing the summary extremely carefully and giving Jack the benefit of your comments and corrections." [Ex. 91.]
Levett's summary of the "history of Hall-Brooke," based on his prior discussions with Solomon, included a description of the creation of the Foundation. It stated that Solomon's
 "charitable gift was made without reservation or condition with the result that after the gift, in 1966, Mrs. Solomon no longer had any equity or beneficial interest whatsoever in the hospital operation."
Elsewhere in the memorandum, he states "Her gift was absolute and complete as of the closing date in 1966." [Ex. 91.] Although Solomon made certain handwritten corrections to the proposal [Ex. 91] and wrote Levett a detailed letter discussing them [Ex. 656] she did not change Levett's description of her gift as "without reservation or condition," and "absolute and complete." Further, even at trial Solomon testified only that she told Attorney Zeldes that she had an employment contract and a lease [Tr. 3711-3715] — both uncontroverted facts. She did not testify that she ever told Zeldes that her creation of the Foundation was conditioned upon the contract or was restricted in any way, or that Levett's memorandum was inaccurate in any respect.
26. Based upon all of the foregoing — including the lack of any written support for Solomon's claim of a conditional gift; the contrary indications in the "founding" documents that the Foundation was properly and unconditionally set up to be governed by its Trustees CT Page 1531 in perpetuity; as well as Solomon's repeated admissions that her creation of the Foundation was unconditional (and, indeed, that her contract was terminable in the discretion of Hall-Brooke's Trustees) — the conclusion is compelled that Solomon's creation of the Foundation was absolute. While Solomon may have hoped and expected that she would continue indefinitely as Hall-Brooke's Executive Director and Trustee, she did not expressly impose any such condition on the "gift" that resulted in the creation of the Foundation.[7]
Hall-Brooke's Management Under Solomon
27. Hall-Brooke began operating as a charity on July 1, 1966. From the beginning, the outside members of Hall-Brooke's Board of Trustees were people of the medical and general business community who volunteered their time to serve on the Board of this charity. None of them was ever paid for serving on the Board. [Tr. 1811.]
28. Early in Hall-Brooke's life as a charitable Foundation, it became the subject of criticism from the community psychiatrists. In light of this criticism, in 1972 Hall-Brooke's Board appointed an independent group of professionals, headed by a highly esteemed Yale psychiatrist named Thomas Detre, to assess Hall-Brooke and make recommendations. The result was a written report which came to be known as the "Detre report." [Tr. 696-700, 2109-2112.]
29. The Detre report criticized Hall-Brooke on several counts, primarily having to do with Solomon's multiple roles within the Foundation. Commenting on the "blurring of task definitions derived largely from the ambiguities in [Hall Brooke's] power structure," the Detre group reported that both community psychiatrists and Hall-Brooke staff perceived that "ultimate decision making" rested in Solomon's hands, that economic interests and management roles were "intertwined," and that Solomon was perceived as "running" the treatment program as well as being intimately involved in business transactions. The Detre group concluded that the "lack of role definitions" at Hall-Brooke was having a "profound effect" on the therapeutic program itself, and recommended that
 "highest priority should be given to restructuring the Board and the administrative organization of the Hospital in a manner which would insure the necessary autonomy a professional staff requires to provide patient care with excellence."
Towards this end, the report recommended that Hall-Brooke should seek to involve local psychiatrists in its administration and staff, and that "serious consideration and study" should be given to the question of whether Solomon should "continue on the Board. . .in view of her acknowledged financial interest in the institution." [Ex. 611B.] Solomon, however, never gave "serious consideration and study" to the CT Page 1532 idea of resigning from Hall-Brooke's Board. [Tr. 2125-27.]
30. One of the things that did happen as an outgrowth of the Detre report was that a new, multi-disciplinary professional advisory board was set up at Hall-Brooke, including several highly respected professionals in the health care field. [Tr. 706-7, 2155-58.] In addition, a number of new Board members joined Hall-Brooke's Board in the early 1970's, all people of excellent standing and reputation in their communities, including two local psychiatrists, Dr. Raoul Schmiedeck and Dr. Gilbert Rose. [Tr. 2158-61.]
31. In late 1974 and into 1975, Hall-Brooke's Board began to have serious discussions about a proposed major building and renovation plan at Hall-Brooke. Since the beginning of the Foundation, it had been recognized that the Hall-Brooke buildings, which were built at the turn of the century, would have to be replaced or modernized in a very significant way if the Foundation could continue as a modern health care facility. [Monitor Tr. 4/25/91, pp. 109-110.]
32. During the Board's (tape recorded) discussions about the contemplated building plans, questions were raised about the Foundation's rights under the lease, and the Board obtained independent legal advice from Attorney John Curran to the effect that the Foundation's rights — particularly its ability to obtain construction financing without the landlord's cooperation — were in serious doubt and that a new lease should be negotiated before any major construction were instituted. [Ex. 441, 616A tape 2 side 1, 598, 617B, 617A tape 1 side 2 and tape 2 side 1, 618A; see also Ex. 596, 442.] In the course of the same discussions, the Trustees also focused on perceived problems of conflict of interest associated with Solomon's multiple roles at Hall-Brooke, i.e. her roles as landlord, trustee and Executive Director. At a March 12, 1975 Board of Trustees meeting [Ex. 618A], Dr. Schmiedeck, one of the two psychiatrists on the Board, described the issue as "the dilemma of Elisabeth having both functions," and expressed his concern that Hall-Brooke did not appear to be a genuine non-profit organization. This concern was echoed by other Board members, including the other psychiatrist, Dr. Rose, who questioned
 "Is this a Board of Trustees for a Foundation which is dedicated to a public purpose, or as appears to be the case, are we a Board of Trustees for a Foundation which essentially is a patina for a private function?"
Eventually, the Board voted unanimously, with Solomon abstaining, to form a committee to "explore with the lessor a solution of the problem of supposed conflict of interest arising out of the same person being landlord and executive director." [Exhibit 618A, 443.] Solomon, however, never did sit down with the committee appointed by the Board. CT Page 1533 [Tr. 2204.] She claimed that this was because the committee never called a meeting [Tr. 2204-8] but the record is clear that Solomon had refused to meet with the Board committee, either directly or through counsel. [Ex. 620A; Tr. 2229-34, 2237-39, 2245.] In fact, as she acknowledged, she felt no need for such a meeting because she personally was convinced there was no conflict of interest. As she put it:
 "[T]here was no problem at hand. There was no proof there was a problem. . .There was no problem whatsoever." [Tr. 2208, 2244-2258.]
33. Also in March, 1975, Hall-Brooke's Professional Advisory Board gave a report to the Hall-Brooke Board which expressed criticism of Solomon's management style. [Exhibit 619.] Echoing the Detre report's criticisms three years earlier, the Professional Advisory Board observed that
 "major decisions are made at the Foundation level by the Executive Director. This creates a feeling that decisions are made outside the hospital. The medical director fulfills an interpreting and at times mitigating role rather than using his own authority in making decisions."
Among the "major problems" noted by the Professional Advisory Board report were recruitment, particularly of the Hospital Director and psychiatric staff. The report recommended that the Medical Director be given greater professional autonomy, and indicated that a new emphasis on medical leadership was mandatory. The report also observed, among other things, that Hall-Brooke's relationship with the local professional community and institutions and agencies of the community "still poses problems," and recommended that tangible clinical and educational services for the community should be encouraged and enhanced, including development and implementation of ideas for services such as a half way house. [Exhibit 619.]
34. Solomon's relationship with the Board continued to deteriorate. A May 22, 1975 Board meeting was particularly acrimonious. All eleven of the voting Trustees were present. At that meeting, several of the Board members expressed their dismay that before coming onto Hall-Brooke's Board they (like the 1972 Board members) had been unaware of Solomon's employment contract or the lease, which they believed to be unfair to Hall-Brooke, and that if they had they would not have joined the Board. The Trustees expressed their concern that in light of Solomon's various roles and her refusal even to consider changing any of them, it was impossible for the Board to function properly. Both of the Trustee psychiatrists opined that Solomon's exercise of absolute power at Hall-Brooke could be detrimental to the treatment of psychiatric patients and to the functioning of the Foundation and, indeed, Dr. Rose tendered his CT Page 1534 resignation, characterizing the Board as "devoid of power," serving only as "window dressing" for Solomon's private enterprise. (Dr. Rose was, however, temporarily persuaded to retract his resignation in the hope that perhaps matters could be worked out.) [Ex. 620A.]
35. During the same period when Solomon was embroiled in conflict with her Board of Trustees and was receiving negative reviews from her Professional Advisory Board, Hall-Brooke was also experiencing regulatory problems — problems which also were attributable to Solomon's intransigence, and which ultimately led to a final rift with most of the Trustees as well as the Advisory Board and Hall-Brooke's counsel.
36. In the Fall of 1974, Hall-Brooke submitted its first application for a rate increase to the CHHC, seeking a rate increase of approximately 25%, or $700,000 in additional gross revenues. [Ex. 53; Monitor Tr. 4/25/91, 18-19.] As noted above, the CHHC was particularly concerned at this time with the issue of Solomon's "relatedness" to Hall-Brooke, and thus it sought information pertaining to Solomon's expenses associated with the lease. [Ex. 614B pp. 41-51; Ex. 615, 623.] Solomon, however, obdurately refused to produce that information, arguing that it was personal and irrelevant. [Ex. 614B pp. 41-50, 99-100; 623C pp. 8-16; Tr. 2316-7.] She persisted in this position despite the CHHC's repeated indications that without the information Hall-Brooke would be denied its much needed rate increase. [Ex. 614B, p. 51, Monitor Tr. 4/25/91, p. 39, 52; Ex. 615, 617, 625 p. 3, Ex. 624, 625, 630d.] She persisted, as well, despite advice of counsel (Wiggin Dana, brought in particularly to deal with the CHHC dispute, Ex. 447) that disclosure was in the best interests of the Foundation [Ex. 627, Tr. 2376], and despite the view of Hall-Brooke's Chairman of the Board that unless the information was provided Hall-Brooke was "absolutely dead in the water." [Ex. 630; Tr. 2384-5, 2388-9.]
37. Finally, at a meeting of Hall-Brooke's Board of Trustees on November 13, 1975, special counsel Michael Eisner of Wiggin Dana told the Board that because of Solomon's refusal to divulge the requested information the firm could not conclude the negotiations with the CHHC and would be constrained to withdraw as counsel. There followed considerable, animated discussion of the impact on Hall-Brooke not only of the pending dispute with the CHHC, but also of the continuing tension within Hall-Brooke's Board associated with Solomon's various roles. For example, Dr. Schmiedeck told Solomon:
 "This is the same old theme. . .I think we have come to the point where Elisabeth has to make the choice, or we have to make a choice. . . .Either you finally decide that you wear one hat or as far as I'm concerned I think we should come to a conclusion as to whether this is a Foundation or not." [Ex. 1031B] CT Page 1535
Another trustee stated:
 "I joined [Hall-Brooke] because I thought I could help make this a splendid institution. Now I find the institution's energies being wasted away to support somebody's private enterprise. And I think my continuing to serve on ethics is an imposition on me." [Ex. 1031B]
Dr. Moss, the Medical Director, expressed his strong concern that the tension that had been going on for months had been having a "profound effect upon the staff, and on the patients and the entire treatment program." [Ex. 1031C.] This concern was echoed by other trustees. The suggestion was made that Solomon should consider resigning, and there was even some passing discussion of the possibility of discharging her. One trustee expressed his view that the alternatives were to "quietly steal away" or to "stay and slug it out" with Solomon. As in the past, Solomon herself insisted that there were "no problems at all." [Id.; Tr. 2437.]
38. The upshot of the November 13, 1975 meeting was that the Board ordered Solomon to produce the requested information to the CHHC. [Ex. 68.] She still refused. [Tr. 2444.] Within days, Wiggin Dana resigned as counsel and seven of Hall-Brooke's nine trustees resigned. [Ex. 70, 75; 631b; Tr. 2464-2465.] Although Solomon claimed to have no idea why this mass resignation occurred [Tr. 2460-3, 2465-2467, 2478], there is no doubt that it was because of the trustees' view that in light of Solomon's intransigence they could not function effectively or meaningfully as a Board. [Ex. 1031B and 1031C.] Soon afterwards, Hall-Brooke's Professional Advisory Committee also resigned, also apparently because of the continuing difficulties with Solomon. [Ex. 635A, 635C; Tr. 2474-6.]
39. Following the resignation of Wiggin Dana and the Hall-Brooke trustees, Solomon went about the task of replacing the Board and retaining new counsel. Cummings Lockwood was retained as general counsel, with David Levett as the partner in charge. Zeldes, Needle Cooper was retained to handle the continuing litigation with the CHHC, with Cummings Lockwood's cooperation and assistance. [Tr. 2481-2, 4358, 4364; Ex. 81, 451, 468.] Ultimately these two firms succeeded in reaching a settlement with the CHHC without producing the Delmon information — but at a very high cost. The settlement permitted Hall-Brooke to charge the rates Hall-Brooke had implemented in 1974, but required those rates to remain in effect without any increase until at least December 31, 1976. [Ex. 93.]
40. As it turned out, Hall-Brooke did not get a rate increase for over five years, because its several rate increase applications were repeatedly rejected for continued failure to provide the information about Delmon. [Ex. 117, 654A, 657A, 135, 245; Tr. 2495-6, CT Page 1536 2516-7.] By the Spring of 1980, Solomon was on a leave of absence from her role as Executive Director (see infra), and Hall-Brooke was finally able to convince the CHHC that it was run by an independent Board of Trustees and that Solomon was no longer in a position to control Hall-Brooke's affairs. [Tr. 2519-20, 4547-4548, 4557-61; Ex. 215.] Because the CHHC was finally convinced of Hall-Brooke's independence from Solomon's control, the CHHC revoked its prior "relatedness" determination and finally granted Hall-Brooke a rate increase. [Ex. 245, 244.] In subsequent years, Hall-Brooke has repeatedly received rate increases, without any difficulty so far as the record shows — despite Solomon's opposition. [See, e.g., Ex. 1073, 1067, 1064, 1060, 1058; see also Tr. 2928-9.]
41. Apart from the professional committees' reports, the battles with the CHHC and the turmoil within the Board because of the perception of Solomon's conflict of interest, Hall-Brooke under Solomon's management was beset with other difficulties as well. Principal among these were problems recruiting and retaining top medical personnel.
42. For example, some years after Solomon purchased Hall-Brooke, Dr. Leo Berman, Hall-Brooke's longstanding clinical director, was fired. Although Solomon denied that she was the cause of any problems with Dr. Berman, she acknowledged that at least after he left Hall-Brooke, this psychiatrist complained that Solomon had been interfering with medical matters [Tr. 2539, 2543, 5201-2, 5240] — precisely the criticism levelled at Hall-Brooke's management by the Detre and Professional Advisory Board reports.
43. In 1976, Hall-Brooke hired a new, highly recommended, Medical Director, Dr. Robert Becker. [Tr. 2545; Ex. 635A and 635C.] Within three months of his arrival, Dr. Becker began looking for another job [Ex. 650A; Tr. 2548] and for about a year after that Hall-Brooke had no medical director at all. [Tr. 2549-2550.] One of the reasons Hall-Brooke had difficulty attracting qualified medical directors in this period was that there was adverse publicity about Solomon and Hall-Brooke [Tr. 2551-2]; at least two highly qualified candidates for the Medical Director position expressed reservations about coming to Hall-Brooke and about working with Solomon because of this negative publicity. [Tr. 809, 914-15, 921, 2552-5.]
44. In 1978, Hall-Brooke's newest Medical Director, Dr. Jose Freire, wrote a lengthy, critical report about Hall-Brooke, describing a "prevailing feeling of apathy, anger and resignation" at Hall-Brooke, with low employee morale and a high degree of employee turnover. The report left no doubt as to Dr. Freire's view that the primary source of the Hospital's multiple problems was Solomon's inappropriate involvement in medical and other clinical matters, her insistence on having "absolute control of even the tiniest detail throughout the organization." Like the Detre report and the CT Page 1537 Professional Advisory Committee reports, Dr. Freire recommended that the medical staff be given more autonomy from Solomon. He proposed that perhaps she could devote herself to the task of planning the much needed new hospital building. [Ex. 654B.] Surprisingly, Solomon returned her copy of Dr. Freire's report unopened [Ex. 656, 656a; Tr. 2621], and she conceded that she never reviewed the report or discussed it with him — because he purportedly never brought up the issue. [Tr. 2623-7.] While Solomon blamed Dr. Freire for this, her attitude about the source of the communication problem is strikingly similar to her explanation of why she never met with the Board of Trustees committee in 1975, as well as her description of the source of the problems with Dr. Berman and, later, with Rosalie Aberman.
45. Dr. Freire sent a copy of his report to the Joint Commission on Accreditation of Hospitals ("JCAH").[8] The following year, during Hall-Brooke's periodic JCAH accreditation survey, Hall-Brooke received a copy of a letter from Dr. Eric Plaut, Commissioner of the State of Connecticut Department of Mental Health, to the President of the JCAH, in which Commissioner Plaut expressed concern that Solomon's "lay leadership" of Hall-Brooke was
 "so strong and so pervasive as to interfere significantly with patient care, negate professional judgments as to appropriate programming and create an atmosphere of low morale with rapid professional turnover." [Ex. 662B; Tr. 2692.]
Again, this was the same concern expressed by professionals repeatedly throughout Solomon tenure's at Hall-Brooke.[9]
Solomon's Leave of Absence and her Termination
46. By the middle of 1979, Hall-Brooke was in great turmoil and difficulty. Hall-Brooke's occupancy or "census" — the source of its revenues — was low; nearly a quarter of Hall-Brooke's available beds were empty. [Tr. 5431-2.] There had been no rate increase since December, 1974. [Tr. 2695.] There were also serious problems collecting outstanding receivables and obtaining credit. Hall-Brooke was keeping accounts receivables on its books since 1966 — long past the expiration of the statute of limitations on collecting such accounts. [Tr. 5433-4.] To make matters worse, in the summer of 1979, there was a computer breakdown at Hall-Brooke, which caused serious problems in Hall-Brooke's business office. [Tr. 2697.] By the Fall of 1979, Hall-Brooke was collecting only sufficient funds to pay employee net payroll and had not paid withholding to the Federal Government for three quarters of the year. [Tr. 5431-2.] Starting in the Spring of 1979, based upon a review of the Foundation's financial statement, Hall-Brooke's bank had concluded that it could no longer finance the Foundation on an unsecured basis and after several discussions with Solomon in which she refused to collateralize the CT Page 1538 loans, the bank called all of Hall-Brooke's loans and refused to deal with Hall-Brooke any further. [Ex. 665; Tr. 5434-5.] Because of problems with its credit Hall-Brooke was also experiencing difficulties paying vendors and was on a cash basis with food and medical vendors. [Tr. 5431-2.] Finally, several key psychiatric positions remained unfilled, leaving a critical void in the hospital's operations. [Tr. 5430-1, 6030.] In general, Hall-Brooke by this time had a reputation as a hospital in serious trouble. [Tr. 6027.]
47. Against this background, in April, 1979, Solomon believed that the "best person available to insure continuity, reaccreditation and stability" at Hall-Brooke was Rosalie Aberman ("Aberman"), then Assistant Director of Hall-Brooke, and Solomon assigned Aberman to run the Hospital. [Ex. 657b; Tr. 2710-3, 5387.] Aberman had been employed at Hall-Brooke since 1976. Soon afterwards, Solomon made plans to take an extended vacation and conference time ending in February, 1980, and then to take a leave of absence. [Tr. 2672-3; 2746-8; Ex. 663.] Solomon testified that the primary reason for her leave of absence was that she wished to focus on the Foundation's much needed building program and fund raising in connection thereto. [Tr. 1033-36.]
48. At a Board meeting on August 16, 1979, Hall-Brooke's Board of Trustees authorized Solomon to take a leave of absence from the Executive Directorship, and appointed her Director of Planning. [Ex. 141, 382.] Although not reflected in the written minutes of that meeting, the tape recording of that meeting shows that at the same time Aberman was appointed Executive Director during Solomon's leave. [Ex. 382.] Solomon stated: "I will state it clearly that the Executive Director that can run the institution is Rosalie Aberman" and Solomon agreed that she would be available for any assignment that Aberman would assign to her, "because the Director of Planning will be reporting to the Executive Director." [Ex. 382.]
49. There is some ambiguity in the documentation as to exactly when Solomon's leave of absence and Aberman's executive directorship commenced. [See, e.g., Ex. 139A, 141, 142, 145, 147, 160, 664.] For purposes of the pending cases this ambiguity is irrelevant. It is clear, however, that Aberman began acting as Executive Director with the Board's approval in the Fall of 1979, and it is in any case undisputed that by March 1, 1980, Solomon was to be on leave of absence and Aberman was to be Hall-Brooke's Executive Director. [Id., Tr. 4136, 4139-40, Ex. 139A and 139B.][10]
50. The formal letter of agreement between the plaintiff and Leo Schnitzer, acting as Chairman of the Board of Trustees of the Hall-Brooke Foundation dated August 16, 1979, provides that during the plaintiff's temporary leave of absence from her position as Executive Director she will perform in the capacity of Director of Planning until resuming the Executive Directorship; and further provides that CT Page 1539 the "existing employment agreement remains in effect" and all the plaintiff's rights arising from that agreement remain in fully effect. (1094-95; ex, 142)
51. A resolution was passed at the August 1979 meeting of the Board of Trustees, "granting Elisabeth F.S. Solomon a leave-of-absence until March 1, 1982 from her duties as Executive Director of Foundation, it being understood that this leave-of-absence shall not affect the terms and conditions of her employment contract with the Foundation." (4607-10; ex. 141).
52. At about the same time as Solomon was discussing the transition of the Executive Directorship from herself to Aberman, a situation was developing that ultimately led to renewed friction with the Board concerning Solomon's role as Hall-Brooke's landlord. In the summer of 1979, Solomon and Hall-Brooke began negotiations towards a proposed lease amendment in anticipation of the contemplated building plans. After an initial exchange of letters between Solomon's attorney, Ira Grudberg, and Hall-Brooke's counsel, David Levett [Ex. 133, 138, 140, 144, 157], Grudberg forwarded a first draft of a proposed lease to Levett. This proposal contemplated that Hall-Brooke would release 18 of the demised acres to Solomon, and continue to pay the same rent for the remaining 7 acres. [Ex. 166.] When Hall-Brooke's Board Chairman, Linsley Pettit, learned of this proposal, he characterized it as a "give away." Attorney Levett was also concerned that the proposal would not pass muster with the CHHC, which had a history of scrutinizing the fairness of Hall-Brooke's rent payments to Solomon. [Tr. 4825-28; Ex. 669.] Before the Board could get back to Solomon with a proposal on how to move the matter along, however, Solomon — in a fit of pique because the negotiations had not yet been concluded — wrote a letter "withdrawing and cancelling" the proposals and announcing that "no further negotiations will be in progress as of this date." [Ex. 174; see Tr. 2843, 4829; Ex. 669A, 670.] It would appear that this was the first sour note in the relationship between Solomon and her most recent Board.
53. Not long after Aberman took over the running of the hospital and became Executive Director, she began making changes. She was successful in recruiting Dr. Theodore Zanker as Hall-Brooke's new Medical Director. [Tr. 2776, 5388, 5436.] She established a new banking relationship after Hall-Brooke's old bank called the outstanding loans. [Tr. 5434-6; see also Tr. 2782-6.] She began taking aggressive steps to collect outstanding accounts receivable owed to Hall-Brooke [Tr. 5433-4], and she negotiated with Blue Cross to deliver Hall-Brooke's average weekly billings, which improved Hall-Brooke's cash flow. [Tr. 5450.] She also negotiated with Yale Hospital to send emergency room patients to Hall-Brooke, with the net result that at the end of Aberman's first year census was up to 92% occupancy. [Tr. 5451.] According to at least one trustee, Aberman also had a better relationship with staff and employees, and in CT Page 1540 general she began to improve the situation at Hall-Brooke. [Tr. 6291, 6294.]
54. There was testimony demonstrating the obvious dispute between Solomon and Aberman as to what Solomon's duties were; from whom she was to take orders; and what Aberman told the CHHC panel regarding same. (TR. 1182-87, 4541-49, 4545-46) The difficulties commenced around November or December and, in Solomon's words, "built and built and built." [Tr. 1278, 3033.] While the details are not relevant for purposes of the pending cases, there were serious differences between Solomon and Aberman as to what the scope of Solomon's and Aberman's authority ought to be, and this caused serious problems for the Foundation. [Tr. 3152-3, 4839-4847, 5455-5459.] There were also serious disputes regarding Solomon's salary and what Aberman had been told about the terms of Solomon's employment contract. (Tr. 1293-94, 4839-4847, 4943-44) By April, 1980, communication had broken down completely [Tr. 1279, 1444-5, 3056-7] and there was a "state of emergency." [Ex. 303.] The situation was exacerbated, in Aberman's view, by the many other problems that Hall-Brooke was experiencing. As she testified, "Hall-Brooke was really on the edge" and Aberman felt "like the dike had 18 holes and I only had ten fingers." [Tr. 5451.]
55. While Solomon testified that she had no problem — only Aberman had problems [Tr. 3161] — she did agree that it was appropriate for the Board of Trustees to be concerned about the impact on the institution of this running dispute about authority. [Tr. 3165.] After various meetings and discussions, a special Board meeting was noticed for May 22, 1980 to consider Solomon's removal for cause from her positions at Hall-Brooke, because of "conduct including interference with and insubordination to the management and conduct contrary to the best interests of Hall-Brooke." [Ex. 371.]
56. When the plaintiff first learned on May 19 that she was being threatened with removal from all her positions at Hall-Brooke, she testified that she was completely shocked and dismayed. After contacting her long-time accountant and friend Morris Klein, she began attempting to find an attorney to represent her. Unable to obtain counsel between May 20, and the scheduled meeting date on May 22, Solomon attended the Board meeting on May 22, 1980, alone and without counsel. (Tr. 1518-20, 4732-33) Many of the previous meetings of the Board of Trustees of the Hall-Brooke Foundation had been tape recorded. The plaintiff attempted to tape record the meeting, May 22, 1980, but she was denied the right to do so. (Tr. 1526-28, 4724, 4865) Two attorneys from Cummings Lockwood took copious notes, that were testified by various trustees to be accurate, and were later typed. (Tr. 4725-4971).
57. At the special Board meeting on May 22, 1980, the Trustees considered numerous documents, listened to comments from a number of CT Page 1541 staff members, and had extended discussion about numerous problems with Solomon, including various manifestations of conflict over Solomon's authority and responsibilities, as well as a controversy concerning Solomon's demand for additional salary and expenses to be paid to her during her leave of absence. [Ex. 379, 376, 377, 378.] After considering all of this, the Board of Trustees voted unanimously, with only Solomon dissenting, to remove Solomon from all her positions at Hall-Brooke. [Ex. 379, 380; Tr. 3205.] Although the Trustees described varying bases for their votes, including their sense that Solomon had not been cooperative or candid with Aberman or with the Board itself on various issues, most Trustees were particularly worried about the Medical Director's and School Director's expressed concerns that Solomon was once again interfering with medical and school affairs, with possible serious deleterious repercussions to staff and to patient care. As one Trustee put it, "She was harassing top personnel to the point where they couldn't do their every day work." [Tr. 6272.] Another trustee stated, "We heard pleadings from the top professional people on the staff of Hall-Brooke asking us to make this change. . .We were persuaded very, very strongly by the professional staff that if there were any further delays, they couldn't be responsible for what would happen with the Hall-Brooke Hospital." [Tr. 6318, 6337.] In the face of these opinions by the professionals in charge of the institution, all of the Trustees felt that Solomon's removal was in the best interests of Hall-Brooke. [Tr. 5114-16, 5130-35, 6087-6096; 6249, 6261-2, 6272, 6290-1, 6294-6, 6311-13, 6318, 6327-8, 6337; see also Tr. 5972-3, 6002-3, 6033-6040, 6046-50, 6062-6063.] The conclusion is inescapable that all of the Trustees, as well as defendants Aberman (who did not vote) and Attorney Levett (who gave Hall-Brooke accurate legal advice in connection with Solomon's removal, essentially in accord with the Court's legal conclusions infra) acted in what they believed were the best interests of Hall-Brooke and not from any selfish or improper motives. [Id.; see also Tr. 4567-70, 4672-4, 4858-4864, 5467-8, 6161, 6297; Ex. 354.]
Hall-Brooke After Solomon
58. Aberman has continued to serve as Hall-Brooke's Executive Director since Solomon's removal in May, 1980. [Tr. 5236.] Shortly after Solomon's removal, the Hall-Brooke license was transferred to the Medical Director, as was more customary and as was suggested by the Commissioner of Mental Health. [Tr. 5412-3.] Hall-Brooke's licensure and JCAH accreditation are current. [Ex. 719, 725, 1057 p. 1B.]
59. While Solomon alleges that Aberman is educationally unqualified to be Hall-Brooke's administrator, the record shows that Aberman's academic qualifications at the time she became Executive Director were approximately equivalent to Solomon's; neither individual had a formal college degree, although Aberman had an CT Page 1542 "equivalency." [Tr. 156, 315-320, 5382-3.] Aberman now has a Master's degree in Business Administration. [Tr. 5383.]
60. Hall-Brooke's Board of Trustees is apparently quite satisfied with Aberman as an administrator. When Rosalie Aberman became acting Executive Director for the period of the plaintiff's leave of absence, she received a pay increase to a rate of $50,000.00 annually. She was, on the day the plaintiff was fired, earning $50,000.00 per year plus benefits. For the calendar year 1980, her gross salary including deferred compensation and bonuses totaled $54,570.80. For 1981, it was $68,273.60. For 1982, it was $76,352.00. For 1983, it was $85,000.24. For 1984, it was $93,786.24. For 1985, it was $106,150.40. For 1986, it was $132,758.56. For 1987, it was $139,758.56. For 1988, it was $157,512.94. For 1989, it was $187,792.48. For 1990, it was $154,507.18. (1641-42; ex. 391) Although Aberman is highly compensated [Ex. 391] there is no support for Solomon's contention that her compensation package is "excessive" or constitutes any kind of self-dealing. Indeed, Aberman plays no role in her compensation, which is determined solely by the Board, based upon an evaluation of Aberman's performance and outside advice from auditors and other experts as to the appropriate compensation for someone in that position. [Tr. 4812-13; 5468-9, 6126-8.]
61. Further, it is apparent that Hall-Brooke has flourished under Aberman's leadership. In October, 1980, a JCAH survey contrasted Aberman's management with Solomon's as follows:
 "Due to extreme effort of new management, this program looks completely different from the previous survey reports. . .New management, the chief executive officer, the medical director and department heads in the past year have brought about a crash program directed to JCAH standards compliance for present survey with excellent results. . .The chief executive officer says she wants 100% compliance with JCAH standards and came very close during this survey. . ." [Ex. 690B, emphasis added.]
In 1982, another JCAH survey reported:
 "This private non-profit 78 bed adult, adolescent and substance abuse hospital has a volunteer community board and has recently been operating at 97.5% capacity. . .New management three years ago had had significant impact on clinical operation and accreditation status when the facility was surveyed by the same surveyor 2 years ago. This same management has now had sufficient time to continue and put into operation more improvements in the clinical and facility operations since then and this is shown by the small number of recommendations resulting from the present CT Page 1543 survey. CEO remains dedicated to 100% compliance with JCAH standards." [Ex. 712A, emphasis added.]
Again, in 1986, a JCAH survey characterized Hall-Brooke as "an exceptionally well run facility." [Ex. 717.] Further, Hall-Brooke currently has a three year accreditation — the highest type given. [Tr. 496-7; Ex. 719; 725.] Although the JCAH has occasionally expressed some criticism of Hall-Brooke and in 1990 made certain recommendations for improvement [Ex. 719], such recommendations are a standard part of the JCAH accreditation process. As Solomon testified, no matter how good a hospital is the JCAH always has recommendations on how to be even better. [Tr. 497]. Further, the JCAH has recently congratulated Hall-Brooke on its "effective resolution" of the JCAH's 1990 recommendations, thus reaffirming the currency of Hall-Brooke's accreditation. [Ex. 725.]
62. Hall-Brooke has kept abreast of the exciting new developments in the field of psychiatry in the last decade [Tr. 5999-6000.] Hall-Brooke's Associate Director, Seth Berman, testified without contradiction that Hall-Brooke has gone "full circle in turning around [its] image in the community" since 1980, and is now viewed by community providers as a "collaborative partner" which has developed many innovative programs to develop and meet community needs. These include an expanded school program, an innovative and acclaimed "halfway" type program for homeless people with emotional and psychiatric disorders; and a comprehensive "partial" or day treatment program. [Tr. 5378-9, 5974-80.] Hall-Brooke has also developed "linkages" with schools, clinics, acute care general hospitals, nursing homes, child guidance centers and other social service providers, and sponsors numerous internships, externships, practicums, and other academic opportunities for various allied health care professionals. [Ex. 718B, pp. 31, 35.]
63. As in any organization, there have been some administrative errors at Hall-Brooke since 1980, including the temporary inadvertent dissolution of the corporation for failure to file biennial reports [Tr. 4786-7; Ex. 386, 387], and a temporary incongruence between Hall-Brooke's by-laws and its corporate charter, which resulted in several Trustees overstaying their terms until the charter was amended [Tr. 4784-5, 4789-4800; Ex. 112, 708A, 388.]. Neither of these matters was either intentional or of great consequence — certainly they do not establish "mismanagement." Nor was there any other evidence of either mismanagement or misuse of funds — at most, Solomon adduced evidence of expenditures by Hall-Brooke and accounting techniques with which she apparently disagrees. There was, however, no evidence of impropriety. To the contrary, the evidence included Hall-Brooke's audited financial statements for virtually each year since Solomon's removal. [Ex. 1010, 1047-1055, 1078.] All of these financial statements were audited by the nationally known accounting firm of Ernst Young, which certified that Hall-Brooke's financial statements CT Page 1544 fairly presented the Foundation's financial position in accordance with generally accepted accounting principals. [See also, e.g., Tr. 535-61.]
Solomon's Post-termination Behavior
64. Since Solomon seeks reinstatement as Hall-Brooke's Executive Director, her post-removal behavior is pertinent. After her removal, Solomon continued representing herself to the world as Hall-Brooke's Executive Director. [Tr. 3226-37; Ex. 692, 693, 694, 695, 699.] After asking her in vain to stop, in February, 1982 Hall-Brooke moved for a temporary restraining order to enjoin Solomon from continuing to hold herself out as an officer, employee and trustee of Hall-Brooke. [Ex. 697B.] While that motion (and several lawsuits already filed by Solomon against Hall-Brooke) were pending, Solomon decided to take matters into her own hands.
65. In the early morning hours of February 17, 1982, Solomon seized physical control of Hall-Brooke, accompanied by uniformed guards. She obtained access to the premises and proceeded to have locksmiths change the locks on Hall-Brooke's executive offices, business and administrative areas. She then ensconced herself in the administrative offices and made announcements on Hall-Brooke's public address system, transmitting throughout the institution to patients as well as staff, telling everyone that she was taking over and that no harm would come to anybody. During the course of the day, Solomon gave interviews and issued press releases distributed to newspapers, radio stations and television stations announcing that she was resuming the Executive Directorship and that Aberman had jeopardized Hall-Brooke's license and accreditation. Meanwhile, Solomon's security guards posted themselves at Hall-Brooke's gates, accompanied by a dog and using walkie-talkies supplied by Solomon. They stopped and questioned all staff as well as patients and their families. They denied access to a list of employees and Hall-Brooke Trustees supplied by Solomon, and distributed purported termination letters from Solomon to 16 employees believed to be Aberman loyalists (including Aberman herself). Despite repeated requests from various people (including the Medical Director) that she leave, Solomon refused until finally she was served with a court order requiring her departure — even then, she would not go until her own attorney advised her to do so. [Tr. 3237-3285, 3295-3339; Ex. 700, 701, 702.]
66. Solomon essentially concedes that her attempted "coup" was not the behavior of a rational person motivated by the best interests of Hall-Brooke or its patients. She testified that she acted as she did because of stress. She claimed to believe that Hall-Brooke's licensure, Medicare certification and JCAH accreditation were in jeopardy. There was no evidence, however, that Hall-Brooke ever lost its license or Medicare certification, and although Hall-Brooke did get a proposed non-accreditation letter from the JCAH in January, CT Page 1545 1982, the letter showed on its face that the accreditation remained in place pending appeal, as Solomon was well aware from similar experiences during her own tenure. She, however, had not inquired prior to invading the premises in February, 1982 whether an appeal had been taken, and in fact Hall-Brooke was successful in appealing the initial negative JCAH decision. [Tr. 4169, 4216, 4243, 4246, 4260-64, 4309-10; Ex. 390, 649A, 651A-1, 667A; See also Tr. 565-6.]
67. The 1982 "takeover" attempt was not Solomon's only unusual behavior since her removal. Solomon's lease with Hall-Brooke requires her to facilitate Hall-Brooke's construction of new children's facilities by subordinating her interest in the premises, subject only to prior existing encumbrances on the property at the time of any construction financing. [Ex. 38, 27.02.] In 1981, Solomon set up a Channel Island corporation called S.E.L.F., and arranged for papers to be prepared purporting to show that S.E.L.F. had extended $25,000,000 in credit to Solomon. She then caused a lien in the amount of $25,000,000 to be placed by her personal attorney upon the Hall-Brooke land records. [Ex. 697, 716.] No money was ever advanced to Solomon under this purported line of credit; nevertheless, the lien remains as an apparent encumbrance on the Hall-Brooke property to date — despite the fact that Solomon has no underlying obligation justifying it. [Tr. 2920-1, 2942, 3421-2, 3422; Ex. 1028.] It therefore appears that the entire transaction was phony[11]; while no direct evidence is available as to Solomon's motives, the logical inference is that the S.E.L.F. transaction was intended as an end run around Solomon's obligation to facilitate Hall-Brooke's construction plans by encumbering the property and thereby impeding any construction financing — precisely as forecast by Hall-Brooke's independent counsel, John Curran, in 1975. (See 32 supra.)
68. Nor is the S.E.L.F; transaction the only obstacle that Solomon has sought to place in Hall-Brooke's path since her removal. She has opposed Hall-Brooke's rate applications before the CHHC, and when despite her opposition the CHHC has granted Hall-Brooke rate increases, she has sued the CHHC. [Tr. 2928-9.] When Hall-Brooke tried, in 1988, to obtain a "certificate of need" from the CHHC enabling it to build and renovate its deteriorating facilities as well as to expand its services — including expanded children's services, for which Solomon thought there was "dire need" even twenty years before [Tr. 460, 765] — Solomon filed a lawsuit against the Foundation and the CHHC to enjoin Hall-Brooke from proceeding. [Tr. 2917-8, 4094; see Ex. 718B.] Although she claimed that she was opposed to the project because it was not site specific [Tr. 4095-6], the CHHC decision ultimately denying the project makes clear that it was to be on the current site. [Ex. 718B, p. 5 15.] Further, the CHHC opinion leaves no doubt that the project was denied largely because of Solomon's refusal to commit one way or the other whether she approved of the project, or agreed to Hall-Brooke's proposed rent increase for the non-children's portion of the project, or agreed to CT Page 1546 subordinate her interest in the premises as required by the lease. Solomon's position, the CHHC concluded, rendered the "financial feasibility and cost effectiveness" of the project too uncertain to be evaluated, and therefore the application was denied. [Ex. 718B, p. 5, 22-23, 32-34, 36.] It is impossible to reconcile these actions with Solomon's claim to have Hall-Brooke's and the public's best interests at heart.
C. SOLOMON'S LEASE CLAIM
69. After Solomon's removal from her positions at Hall-Brooke, she still remained Hall-Brooke's landlord and still received rent from Hall-Brooke annually. [Tr. 3369.] In each year since 1980, Hall-Brooke has paid the "net rent" specified in the lease, which has escalated from $211,750 in fiscal year 1981 to a current payment of $256,218. [Ex. 1079; Tr. 5957.]
70. Solomon testified that the rent paid is not the amount specified in the lease, and that she has a claim for additional rent on account of Hall-Brooke's construction of a school building in 1975 "and other items." [Tr. 3370.][12] There was, however, absolutely no evidence of any lease claim other than that related to the school building constructed in 1975 (the "School"), and Solomon is deemed to have abandoned any other claim. Further, as recently as 1987, Solomon represented in her own sworn affidavit as well as the opinion of her counsel given to her mortgagee, the Bank of Boston, that her only dispute with her tenant relates to a claim for additional rent on account of the "children's center" in the amount of $4,102.92 per month[13] and that otherwise the lease is in full force and effect without modification or default by the tenant. [Ex. 1030A, 1030B; see also Ex. 718A, pp. 2-3.] Finally, Solomon concedes that the school is part of the "Children's Residential Treatment Complex" referred to in Article 27 of the lease. [Tr. 3660-1.] (See also Plaintiff's Proposed Findings of Fact, para. 66.)
71. It is undisputed that when Hall-Brooke constructed the School, at the cost of approximately $400,000, it did not increase its rent payments to Solomon. Solomon claims that she is entitled to increased rent under Article 28.01 of the lease, which deals with enlargements and substantial alterations. She testified that at the time the lease of 1969, exhibit 38, was executed, it was her understanding and belief that Section 28.02 and Section 27.01 related to each other, so that the amount of the increased rent to be paid as a result of the construction of any portion of the Children's Residential Treatment Center Complex would be determined according to the provisions of Section 28.02. She claims that that rent increase was separate and distinct from the increase in base rent to $175,000.00 per year, the consideration for which was the longer lease term, permission to build and other alterations of the previous lease. (3665-67, 4269-4303, ex. 596-597) Hall-Brooke claims that the rental CT Page 1547 payments made under the lease since 1969 anticipated and included the Children's Residential Treatment Center of which the School was a part, and therefore no additional rent is owed. [Complaint No. 83-6826, Second Count; Answer, Second Count and Special Defenses.] In fact, Hall-Brooke claims in its brief that the extra $65,000.00 (old rent was $110,000.00, see para. 75 infra) was in consideration of the school complex and that it, in effect, over paid nearly $400,000.00 over the six years when the lease was in operation but the school was not yet built.
72. Prior to her removal Solomon never demanded any increased rent on account of the School. She testified, however, that she offered the Board to defer the rent due until the School became profitable. [Tr. 1222-24.] The only direct evidence of actual demand that was either introduced or is subject to judicial notice is in the Complaint itself. (Complaint No. 83-6826, Second Count, Paragraph 11).
73. On January 9, 1969 the subject lease was presented to the full board, at which time Attorney Meister explained that the purpose was to secure the premises for a 50 year period so that the buildings to be erected could be amortized over their useful life span. (Ex. 36). At the next meeting of the full board held on March 18, 1969, Attorney Boyd, representing the foundation, "reviewed the major terms of the lease; the justification for the rent based upon the present and potential use of the property; the opinion of Brennan Brennan, appraisers, regarding the valuation of the property and the rent." Following a discussion of amendments to Art. 12, the board unanimously voted that Attorney Boyd be authorized to execute the lease for the Board of Trustees. (Ex. 37).
74. On January 17, 1975, Brennan Brennan submitted an appraisal to the Board of Trustees wherein they state that the "subject property is being leased at a sum of $192,500.00[14]
not including the new school facility." (Ex. 56, on p. 72) Emphasis added. A separate and additional figure of $40,700.00 was assigned to the school. This appraisal was requested by the Board of Trustees. There was no evidence offered by the defendant to contradict this statement; in fact, there was a follow up letter dated January 20, 1975 by the appraisers to the Board, at Professor Barone's request, which provided "a separate Valuation Summary of the school building constructed in 1974 with the estimated rental for it." (See insert to Ex. 56) Again, this was requested by the board of trustees, accepted by it and no contradiction was offered when the appraisers set forth the same figures previously given. Indeed, the appraisal (Ex. 56) was specifically reviewed at the January 30, 1975 Board Meeting. (See Ex. 442 — Minutes submitted by Kirsten T. Lawrence, Assistant Secretary.) On March 4, 1980 the board again had the property appraised. This appraisal set the fair rental value of the property at $265,400.00, and the fair market value of the property at $2,654,000.00. (Ex. 220) CT Page 1548 The appraiser explicitly states that the school building was not included as an improvement for appraisal purposes (Id. at 4.) That rental figure, exclusive of the school, was considerably more than the foundation was paying Solomon pursuant to Art. 2 of the lease for what the defendant asserts was all of Hall-Brooke's land and improvements.
75. In 1968, the IRS conditioned Hall-Brooke's tax exempt status on Hall-Brooke's reduction of the rent from $136,000 to $110,000. Solomon did initially reduce the rent from $136,000 to $110,000. Then, in January, 1969 the Foundation entered into a new lease with her. The new (current) lease increased the rent to $175,000 a year subject to increase every five years thereafter. [Ex. 38; Tr. 2099.]
76. At a deposition prior to the trial of these cases (admitted in evidence during the trial), Solomon testified as to the basis for the $65,000 rent increase in 1969. She maintained that this increase was justified because of additional benefits that the new lease gave the Foundation, in particular because it gave the Foundation permission to build a new facility for children's services, because she agreed to subordinate her debt to accomplish that and because of its 50 year term. [Tr. 4269-71.] This Court finds Solomon's testimony, as significantly bolstered by the extrinsic evidence to support her contention that the rental increase of $65,000.00 was not on account of the "Children's Residential Treatment Complex," including the School, to be persuasive.
II. CONCLUSIONS OF LAW
A. THE REINSTATEMENT/RESCISSION CASE, NO. 83-0213998
The keystone to Solomon's claim of entitlement to injunctive relief in this action is her claim that as a factual matter her creation of Hall-Brooke Foundation was expressly conditioned on Hall-Brooke's written promise to give Solomon "continual and permanent supervisory and visitorial participation in the Foundation." [Revised Complaint 13-15.] As has been discussed in detail above, however, the Court finds Solomon's claims to be factually unsupported, except by Solomon's own testimony, which the Court finds inherently unbelievable — particularly from a person with the apparent sophistication of Solomon, and in connection with a transaction where she was advised by counsel as well as various other experts on non-profit health care institutions.
While Solomon implies that she created Hall-Brooke as a non-profit institution for purely eleemosynary reasons, sacrificing much and obtaining nothing in return except the promise that she could continue as Hall-Brooke's Executive Director and Trustee for life, the evidence showed plainly that Solomon's decision to go non-profit was based less on charitable concerns than her perception that there were pragmatic, financial advantages to be gained for herself and for the CT Page 1549 Hospital. Far from making financial sacrifices, it appears that Solomon leveraged the transaction so that she put in very little capital but received considerable and immediate financial rewards, including among other things a highly favorable lease and a lucrative salary for her services. Most importantly, although Solomon unquestionably hoped that she would be able to dominate the Foundation forever, there is absolutely no support for her claim that the creation of the Foundation was subject to her right to continue as Hall-Brooke's Executive Director and Trustee in perpetuity.
As a preliminary matter, there was no donative document here, such as a written trust or other instrument which could have imposed such a condition on the Foundation. Even if there had been a formal trust or other instrument, only Solomon's expressed intent would control. As the Connecticut Supreme Court has stated
 "The construing court will put itself as far as possible in the position of the. . .[settlor], in the effort to construe. . .[any] uncertain language used by him in such a way as shall, conformably to the language, give force and effect to his intention." . . .But "[t]he quest is to determine the meaning of what the. . .[settlor] said and not to speculate upon what he meant to say"
* * *
 Even if it were clear that the settlor had mistakenly reposed confidence in [the trustee] in regard to the use which [the trustee] would make of her uncircumscribed power of invasion, we could not correct that error of judgment by rewriting the trust instrument to curtail a power expressly granted. The settlor's expectations as to what action the [trustee] would take and his clearly expressed intention to give her full freedom to take such action as she pleased are two different things. It is only with the latter with which we are concerned. "[E]ven if future events did not accord with. . .[the settlor's] anticipations, the eventualities must be adapted to the terms of the trust, not the trust to the events."
Connecticut Bank Trust Co. v. Lyman, 148 Conn. 273, 278-9, 282-3
(1961) (citations omitted, emphasis added).
Neither Solomon's employment contract, nor any of the documents associated with the creation of Hall-Brooke impose any condition upon the creation of the Foundation in Solomon's favor. To the contrary, the record is replete with Solomon's admissions — often under oath and over a period spanning many years — that her "gift" was unconditional and absolute, and that she gave complete freedom to Hall-Brooke's trustees to operate the Foundation in the best interests CT Page 1550 of the public as they saw them. Under these circumstances, it appears that Solomon is essentially asking the Court to rewrite history to accord with her anticipations — in the words of the Connecticut Supreme Court, to conform the "gift" to the events because events did not accord with her anticipations. Connecticut Bank Trust Co. v. Lyman, supra, 148 Conn. at 282. This the Court cannot and will not do.
Indeed, there is serious doubt whether conditions such as those Solomon claims could have been legally imposed upon the Foundation at all. The founder of a federally tax exempt organization may not claim any special benefits from the charitable organization. Basic Bible Church v. Commissioner, 74 T.C. 846 (1980), aff'd,739 F.2d 265 (7th Cir. 1984); Church of the Transfiguring Spirit, Inc. v. Commissioner, 76 T.C. 1 (1981). Thus, if Hall-Brooke had given Solomon special benefits simply because of her status as founder, then Hall-Brooke's tax exempt status might have been jeopardized. See Easter House v. United States, 12 Cl. Ct. 476 (1987), aff'd without opinion, 846 F.2d 78 (Fed. Cir.), cert. denied, 488 U.S. 907 (1988); Church of Scientology of California v. Commissioner, 823 F.2d 1310
(9th Cir. 1987), cert. denied, 486 U.S. 1015 (1988); Bubbling Well Church of Universal Love, Inc. v. Commissioner, 670 F.2d 104, 105 (9th Cir. 1981); Founding Church of Scientology v. U.S., 412 F.2d 1197
(1969), cert. denied, 397 U.S. 1009 (1970); Mabee Petroleum Corp. v. U.S., 203 F.2d 872 (5th Cir. 1953).
Further, even if Solomon had expressly conditioned her "gift" upon the enforcement of her 31 year employment contract and/or her purported lifetime trusteeship, and even if such a condition would not have rendered the Foundation a nullity right from the start (or thereafter, when it came to the attention of the Internal Revenue Service), it is highly questionable whether either Solomon's long term employment contract or her purported life-time trusteeship are enforceable as a matter of public policy.[15] Connecticut statutes give directors or trustees of corporations like Hall-Brooke the right to manage the activities, property and affairs of the corporation. C.G.S. 33-447(a).[16] This right includes the right to appoint officers and to remove officers, with or without cause, but without prejudice to their contract rights, if any. C.G.S. 33-453(a), (b). "There is some authority for the proposition that directors have no power to hire an employee on a lifetime basis. . .such cases are generally based on the theory that a board of directors, in selecting the management personnel of the corporation, should not be allowed to hamstring future boards in the overall supervision of the enterprise and the implementation of changing corporate policy." Osborne v. Locke Steel Chain Co., 153 Conn. 527, 537 (1966). See also, e.g., Lee v. Jenkins Brothers, 268 F.2d 357, 366-369 (2d Cir. 1959), cert. denied, 361 U.S. 913 (1959) (collecting cases in effort to ascertain Connecticut law) (Reasons given to support conclusion that lifetime employment contracts are "extraordinary" and unenforceable include: CT Page 1551 "they unduly restrict the power of the shareholders and future boards of directors on questions of managerial policy; they subject the corporation to an inordinately substantial amount of liability; they run for long and indefinite periods of time."); Borland v. John F. Sass Printing Co., 95 Colo. 53, 32 P.2d 827 (1934) (holding that vice president who claimed to have been employed for indefinite duration was employee terminable at will; "This alleged contract surrendered to [the plaintiff, at his will and for an unlimited time, the power and duty of stockholders or directors to elect officers and select employees. The statutes and public policy will not permit such a surrender."); General Paint Corp. v. Kramer, 57 F.2d 698, 703 (10th Cir.), cert. denied, 287 U.S. 605 (1932) ("[I]t is a matter of grave doubt whether a board of directors, elected for one year, can expressly authorize contracts that deprive succeeding boards of their statutory powers of management."); Beaton v. Continental Southland Savings Loan Ass'n. , 101 S.W.2d 905, 909 (Tex.Civ.App. 1937) (voiding 10 year contract as against public policy; the long term contract "takes from the incoming board of directors the powers given it both by statute and the [corporate] by-laws."); Clifford v. Firemen's Mutual Benevolent Ass'n. , 232 App.Div. 260, 249 N.Y.S. 713
(1931) (dismissing action to enforce alleged lifetime employment contract on ground that "directors could not impose an obligation on the corporation or its constantly changing membership to continue for a long period beyond their term of office and thus hamper the action of future boards."), aff'd without op., 259 N.Y. 547, 182 N.E. 175
(1932). And see Restatement (Second) of Torts 774, comment a ("One who by appropriate means causes the nonperformance of an illegal agreement or an agreement having a purpose or effect in violation of an established public policy is not liable for pecuniary harm resulting from the nonperformance. . .There are. . .types of agreements that violate a definite public policy recognized by the courts, such as contracts for life employment in control of a corporation. . .")
These public policy arguments should apply equally to invalidate life-time trusteeships. Indeed, Connecticut statutes limit any trustee's term to five years per term, and as with officers, authorize the directors of a non-profit corporation to remove any other directors with or without cause. C.G.S. 33-448(d), (h), 33-451(b). See also Fletcher Cyc. Corp. 9 Perm Ed.) 351 (corporation may remove directors for cause "irrespective of any provision in a statute, charter, or by-laws); Grace v. Grace Institute, 19 N.Y.2d 307,226 N.E.2d 531, 279 N.Y.S.2d 721 (1967) (rejecting argument that life trustee could never be removed under any circumstances).
These public policy arguments against lifetime or long term agreements which may hamper the long-term freedom of the management of a corporation should apply with even greater force to a non-profit organization such as Hall-Brooke, whose trustees are barred from granting special benefits to the "founder" of a non-profit organization but are bound to act solely in the best interests of the CT Page 1552 Foundation. The Court's conclusion that the creation of Hall-Brooke was not conditioned as Solomon testified eliminates the need to reach the question of the enforceability of her written employment contract or the purported lifetime trusteeship. However, in the event a reviewing court determines that this Court abused its discretion in making such a finding, the record should reflect the persuasiveness of the strong public policy arguments against such long-term arrangements which only cast further doubt on Solomon's assertion that (after consultation with two competent attorneys at the time of its inception) the creation of this charitable foundation was dependant upon the perpetuation of such arrangements.[17]
Because the Court finds as a matter of fact that Solomon did not and as a matter of law could not legally have conditioned her "gift" upon her purported continuing right to employment or to serve as a Hall-Brooke trustee, the number of issues left for resolution is few. By deciding that the length of term involved in both her employment contract and trusteeship is what is problematic,[18] this Court is left with an employment contract and a trusteeship both of which are terminable with or without just cause according to Conn. Gen. Stat. 33-451(b) and 33-453(a)(b).[19]
Generally, employment contracts fall into two categories — those terminable at will and those terminable upon just cause.
 "[W]here a contract of employment is not for a definite or determinable duration, it is terminable at the will of either party at any time and for any reason not involving `"impropriety. . .derived from some important violation of public policy." Sheets v. Teddy's Frosted Foods, Inc., [179 Conn. 471, 475. . .(1980)]. Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 572. . .(1984). . .Performance of satisfactory service is not a measurable standard that would prevent an employer from dismissing without reason an employee under contract for a definite or determinable term. Being subjective in nature, its only measure is the personal choice of the employer. It does not require that there be an accountable reason for termination of employment that is subject to judicial scrutiny. Its scope does not reach that of good or just cause for termination of employment.
 An employment contract for a definite or determinable term, however, may be terminated by either party only for good or just cause. Good cause, as distinguished from the subjective standard of unsatisfactory service, is defined as `[s]ubstantial reason, one that affords a legal excuse. . .[l]egally sufficient ground or reason.' Black's Law Dictionary (5th Ed. 1979). Good cause or `[j]ust cause substantially limits employer discretion to terminate, by requiring the employer, in all instances, to proffer a proper reason for dismissal, by CT Page 1553 forbidding the employer to act arbitrarily or capriciously. See Pierce v. Ortho Pharmaceutical Corporation, 166 N.J. Super. 335, 341, 399 A.2d 1023 (1970).' Sheets v. Teddy's Froster Foods. Inc., supra, 475. In any contract of employment for a fixed period, an employee prematurely discharged without good or just cause may recover damages. Roy v. Woonsocket Institution for Savings, 525 A.2d 915, 917 (R.I. 1987); see Isenberg v. California Employment Stabilization Commission, 30 Cal.2d 34, 39, 180 P.2d 11 (1947); Saari v. G. C. Dates 
Associates, 311 Mich. 624, 628-29; 19 N.W.2d 121 (1945)."
Slifkin v. Dondec Corp., 13 Conn. App. 538, 548-49 (1988).
Because the Court has in effect stricken the term of duration under the contract, it would appear that we are left with a contract terminable at will as it is no longer for a definite or determinable duration. Id. at 548. As such, the Board of Trustees were free to terminate Solomon which firing this Court sustains in the absence of any "demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 475
(1980). See Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 572
(1984) (wherein the Court refused to enlarge the circumstances under which an at-will employee may successfully allege his dismissal beyond the situation when the reason for his discharge involves such type of impropriety.) See also Morris v. Hartford Courant Co., 200 Conn. 676, 679.2. (1986). Additionally, in the absence of any impropriety that contravenes some important public policy, an at will employee may not challenge a dismissal based upon an implied covenant of good faith and fair dealing. Carbone v. Atlantic Ridgefield, 204 Conn. 460, 470-471
(1987).
Conn. Gen. Stat. 33-453(a)(b) also allows for termination with or without just cause; however, should the Appellate Court rule that this contract was not terminable at will, this Court is prepared to address the matter as if the contract were one terminable only upon just cause.[20] It can be done quite simply by referring back to the Findings of Fact, in specific the recitation contained in paras.54-57. Not only did the trustees vote based upon information supplied by Aberman and advise by Levett, but they personally interviewed both Seth Berman and Dr. Theodore Zanker to corroborate and substantiate the allegations. Additionally, they each had first hand familiarity with Solomon and the numerous clashes she had had with all those charged with running the Foundation. The four month trial of these cases was replete with testimony from the trustees as well as Berman and Dr. Zanker substantiating the problems Solomon caused. See e.g. (Tr. 6272, 6318, 6337, 5114-16, 5130-35, 6087-96, 6249, 6261-2, 6272, 6290-1, 6294-6, 6311-13, 6318, 6327-8, 6337, 5972-3, 6002-3, 6033-40, 6046-50, 6062-63). Based on the record of the minutes of the meeting and the testimony elicited by all parties over CT Page 1554 a four month period, there is no doubt that cause for termination had been established.[21]
Only one question is left, and that is the manner of discharge. For an at will contract, the manner of discharge is actionable if at all, only where demonstrably improper:
 Unless there is an expansion of the Sheets requirement or an additional exception to the traditional common law employment at will discharge rules, the reason for or the manner of discharge must be not only demonstrably improper, but the impropriety must be derived from some important violation of public policy.
Carbone v. Atlantic Richfield Co., 204 Conn. 460, 469 (1987). There has been no allegation of an impropriety that was derived from some important violation of public policy; nor has there been any evidence to substantiate one.
Even for a contract terminable for cause, Connecticut has not determined that there is a right of fair procedure separate and apart from those rights set forth in the contract itself. Analogous to the federal constitutional right of due process (as articulated in Board of Regents v. Roth, 408 U.S. 564 (1972); and Perry v. Sinderman,408 U.S. 593 (1972)) which applies exclusively to public employees, California and Arizona have held that there exists a common-law right of fair procedure, including notice of the reasons for the dismissal and a reasonable opportunity to respond, before being dismissed. See Ezekial v. Winkley, 572 P.2d 32 (1977); and Bock v. John C. Lincoln Hospital, 702 P.2d 253 (1985). However, Connecticut has not adopted such a rule where no state action is involved. Nor does this Court feel inclined to accept the invitation in the absence of significant or widespread authority. However, again so that the appellate record is complete should a reviewing court adopt such a rule, this Court will address the fairness of the proceeding.
Solomon had two or three days notice of the hearing of May 22, 1980. As Ex. 371 shows, the meeting was held to consider the removal of Solomon as Treasurer, Director of Planning, Director of American Management Counsel and Trustee as well as from her positions as Officer, Employee and Trustee pursuant to the applicable by-laws. The reasons were her conduct including interference with and insubordination to the management and conduct contrary to the best interests of Hall-Brooke Foundation, Inc. Additionally, the summary of conduct, Ex. 367, which sets forth several allegations, ten to be exact, that were supported by underlying documentation had also been provided to Solomon on May 20, 1980. She brought with her to the May 22, 1980 meeting a letter which responded, not specifically to the allegations, but which instead pointed the finger to Aberman as the cause for all the recent friction, claimed Aberman was deficient and CT Page 1555 not deserving of her position, and demanded Aberman's termination; the letter also challenged Levett's conduct, his role as counsel to the Foundation and his competence. Solomon also sought a two week continuance to respond more fully, which request was denied.
Because there is very little authority as to the standards and remedies to be applied where the "right of fair procedure" has been violated, this Court has consulted cases wherein the right to a pretermination proceeding was constitutionally required. As stated in the seminal case, Cleveland Board of Education v. Loudermill, 470 U.S. 532
(1985).
 "The pretermination hearing, though necessary, need not be elaborate. . . .Here, the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. See Bell v. Burson, 402 U.S., at 540.
 The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. See Friendly, `Some Kind of Hearing,' 123 U. Pa. L. Rev. 1267, 1281 (1975). The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. See Arnett v. Kennedy, 416 U.S., at 170-171 (opinion of POWELL, J.); id., at 195-196 (opinion of WHITE, J.); see also Goss v. Lopez, 419 U.S., at 581. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee."
Id. at 545-46,[22]
The hearing of May 22, 1980, while not a model, did what was required even under the constitutional standard. The issue of counsel and continuance fall, if at all, into the concurring opinion which had earlier been rejected by the Supreme Court in an earlier case. Id. at 548. (Marshall, J.) Finally, even if the hearing on May 22, 1980 did not fully comport with the applicable standard of Cleveland Board of Education v. Loudermill, supra, the fact that the termination was justified makes any deprivation of the right to procedural due process (or fairness in procedure) deserving of a mere nominal sum of money.
 "Common-law courts traditionally have vindicated deprivations of certain `absolute' rights that are not shown CT Page 1556 to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.
 Because the right to procedural due process is `absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, see Boddie v. Connecticut, 401 U.S. 371, 375 (1971); Anti-Fascist Committee v. McGrath, 341 U.S. at 171-172
(Frankfurter, J., concurring), we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury. We therefore hold that if, upon remand, the District Court determines that respondents' suspensions were justified, respondents nevertheless will be entitled to recover nominal damages not to exceed one dollar from petitioners."
Carey v. Piphus, 435 U.S. 247, 266-67 (1977).
This case was recently relied upon in Tedesco v. Stamford,24 Conn. App. 377, 383 (1991):
 "Although the federal circuits do not agree on this issue, the Second Circuit is among those interpreting Carey as requiring a plaintiff to prove causation between the constitutional deprivation and any purported injury. The Second Circuit held that it was reversible error not to instruct a jury to award only nominal damages if the jury finds a complainant would have been discharged even if he had received procedural due process. Stein v. Board of New York Bureau of Public Transportation, 792 F.2d 13, 18-19 (2d Cir.), cert. denied, 479 U.S. 984, 107 S.Ct. 572, 93 L.Ed.2d 576 (1986). `[B]ack pay is not recoverable when the employer can show that the discharge would still have occurred absent procedural [due process] defects.' Wheeler v. Mental Health Mental Retardation Authority, 752 F.2d 1063, 1071 (5th Cir.), cert. denied, 474 U.S. 824, 106 St. Ct. 78, 88 L.Ed.2d 64 (1985). If a plaintiff's discharge is justified, he is precluded from recovering for procedural deprivation, lost pay or lost retirement fund contributions as elements in his claim for damages. Burt v. Abel, 585 F.2d 613, 616 (4th Cir. 1978)."
Id. at 383. CT Page 1557
Based upon all of the above, even were this Court to find a right to fairness of procedure (without any state action) there would be no harm caused Solomon under the facts of this case. "[W]here a deprivation [of employment] is justified but procedures are deficient, whatever distress a person feels may be attributable to the justified deprivation rather than to deficiencies in procedure." Tedesco v. Stamford, supra; citing to Carey v. Piphus, supra at 263. This is clearly a case where the deprivation of the plaintiff's job was justified whether or not the termination procedure utilized by the defendant was arguably deficient. As a result, Solomon is not entitled to compensation for the abstract value of a procedural right, were she even entitled to it in the first instance.
Finally, the Court holds as a matter of law that even if Solomon had established that Hall-Brooke were liable to her on the merits (and she has not), she would not be entitled to the injunctive relief that she seeks, i.e. either reinstatement to her positions at Hall-Brooke, or rescission of her gift. Injunctive relief is, of course, an extraordinary remedy to be exercised in the Court's discretion with caution. In order to establish a right to an injunction, a plaintiff must prove that she has been irreparably harmed and has no legal remedy. Beyond that, however, the Court may consider the relative harm to others should the injunction issue, and will properly deny injunctive relief if it concludes that the injury which will result from interference by injunction is greater than that complained of by the plaintiff. Anderson v. Latimer Point Management Corp., 208 Conn. 256, 262 (1988) and cases cited; Silitschanu v. Groesbeck, 208 Conn. 312, 318 (1988); Buckner v. Shorehaven Golf Club, Inc., 13 Conn. App. 503, 504 (1988).
Solomon simply has not made out any justification for injunctive relief. She has not buttressed her bare allegations of irreparable harm or lack of legal remedy with any evidence whatsoever. Further, the types of injunctive relief Solomon seeks would be particularly inappropriate on the record adduced in over four months of trial. Solomon's primary demand is to be reinstated to all of her positions at Hall-Brooke, ostensibly because Hall-Brooke has deteriorated under Aberman's management, and can only "regain" its alleged loss of status through the return of Solomon to all of her positions. There is, however, absolutely no factual support for Solomon's claim that the public interest would be best served by her reinstatement, and indeed the evidence is to the contrary. As has been abundantly demonstrated, Hall-Brooke under Solomon's tenure was beset with difficulties attributable largely, if not solely, to Solomon's personality and management style and her insistence on maintaining total control over Hall-Brooke's affairs. There is no question that this had a deleterious effect on the Foundation, both internally (e.g. high staff turnover, inter-staff friction) and externally (e.g. negative perception among community professionals, CT Page 1558 negative publicity, extremely poor relationship with the CHHC, with resulting negative impact on the Foundation's financial condition). Further, the evidence showed that after her termination, Solomon's behavior has been anything but good for Hall-Brooke. Examples of this include her bizarre entry onto the premises in 1982, without apparent regard for the welfare of patients; her obstructive behavior with respect to Hall-Brooke's rate applications and building efforts — despite her acknowledgment that Hall-Brooke needs to build and the self-evident advantages to Hall-Brooke from obtaining rate relief; and her bogus imposition of the S.E.L.F. lien on the Hall-Brooke property in the face of her lease obligation to facilitate the Foundation's construction efforts.
By contrast, Solomon adduced absolutely no evidence of any deterioration of Hall-Brooke under Aberman, nor was there any evidence that Aberman's leadership has engendered any of the types of friction or problems that characterized Solomon's tenure. Instead, the record shows that Hall-Brooke is thriving, and indeed has continued to grow and has considerably improved its relationship not only with the CHHC, but with other local and state agencies and with the community.
While Solomon did adduce evidence of some procedural lapses at Hall-Brooke (e.g. the Foundation's technical dissolution and erroneous failure to amend its certificate of incorporation), none were detrimental to the Foundation's operations and none come close to justifying the extraordinary injunctive remedy Solomon seeks. To the contrary, in each instance, the law confirms the de minimis nature of the issue. E.g., C.G.S. 33-497(f) (when a corporation is reinstated after dissolution it is "revested with its corporate rights and powers"); C.G.S. 33-473 (corporation may amend its certificate of incorporation at any time in any and as many respects as desired so long as it includes all required provisions and only such as are lawful); Levine v. Randolph Corp., 150 Conn. 232, 243 (1963) (duly elected directors hold office until their successors have been elected and qualified); State v. Carroll, 38 Conn. 449, 467 (1871) (quoted in 2 W. Fletcher, Cyclopedia of Corporations, 384 [Rev. Vol. 1982 and 1985 Supp.] as "the leading case" for the proposition that hold over directors are de facto officers who have the same powers and duties as duly elected de jure officers).
Similarly, there is simply no evidence of financial mismanagement or impropriety as Solomon alleges — at most, the record shows that Hall-Brooke's management has made judgment calls different from those that Solomon might have made. There is a statutory presumption that directors of a corporation act properly if they act in good faith and in accordance with what they believe to be in the corporation's best interests. C.G.S. 33-447(d). Further, directors enjoy a presumption of sound business judgment when they act in good faith, which courts will not disturb in the absence of fraud, bad faith, gross overreaching or abuse of discretion, if any natural CT Page 1559 business purpose can be attributed to those decisions. See, e.g., Panter v. Marshall Field Co., 646 F.2d 271, 293 (7th Cir.), cert. denied 454 U.S. 1092 (1981); Estate of Detwiler v. Offenbecher,728 F. Sup. 103, 148 (S.D.N.Y. 1989) (id.); BNS, Inc. v. Koppers Co., Inc.,683 F. Sup. 458, 474 (D.Del. 1988) ("To overcome the presumption enjoyed by the directors by virtue of the business judgment rule, the plaintiff has the `burden of persuasion to show a breach of the directors' fiduciary duties.'") As one Connecticut Court has stated in rejecting a demand for injunctive relief against a hospital:
 It is a fundamental and generally accepted rule that courts will not interfere with the internal management of a private corporation. Questions of policy and management are left solely to the honest decisions of the officers and directors, and the court is without authority to substitute its judgment for theirs. The same rule applies to private hospitals.
Edson v. Griffin Hospital, 21 Conn. Sup. 55, 59 (1958). Accord Herman v. St. Vincent's Medical Center, 3 C.S.C.R. 206 (1988) ("The Court should not, by way of injunctive relief, interfere in the management of the defendant's affairs" by requiring hospital to retain surgery chief). Solomon has not adduced sufficient evidence to rebut these presumptions.
Indeed, even if Solomon had proven that she was a better leader than Aberman (which she has not), the Court would be exceedingly reluctant to order reinstatement of Solomon. It is well established that specific enforcement of employment relationships is among the most rarely granted of injunctive remedies. See, e.g., Burns v. Gould, 172 Conn. 210, 215 (1977); Herman v. St. Vincent's Medical Center, 3 C.S.C.R. 205 (1988). And see Bell v. Hartford Hospital, 1 C.S.C.R. 709 (1986). See also 5A Corbin, Contracts 1204, p. 398 (1964) ("It is almost universally held that a contract for personal services will not be specifically enforced, either by affirmative decree or by an in injunction."); D. Dobbs, Remedies, 12.25, p. 929 (1973) (same); Restatement (Second) of Contracts 367(1) (same); Annotation, "Specific Performance", 71 Am.Jur.2d 163 (1973) (same). This rule has often been strictly enforced to deny specific performance of employment contracts, including in the context of health care employment. See e.g. Herman v. St. Vincent's Medical Center, 3 C.S.R. 205 (1988), (wherein the Court denied a surgeon's application for a temporary injunction to retain his status as chief of the thoracic and cardiovascular division and head of the open heart surgery program at St. Vincent's Medical Center, applying the business judgment rule as well as the general rule that personal services contracts may not be enforced by way of injunctive relief.). In Sarokhan v. Fair Lawn Memorial Hospital, Inc., 83 N.J. Super. 227,199 A.2d 52, 55 (1964) the Court refused to require a hospital to reinstate the plaintiff as medical director and director of surgery, CT Page 1560 despite plaintiff's claim of a ten year irrevocable employment contract:
 The contract herein was one for the rendition of personal services. This is so even though the duties of the job required a person "knowledgeable in the medical arts and in the processes of medical administration," as the contract noted. Personal service contracts are generally not specifically enforceable affirmatively. Equity will not compel performance of the personal services, even where the contract involves a "star" of unique talent, because equity will not make a vain decree. . .
Similarly, the Court in Zannis v. Lake Shore Radiologists,73 Ill. App.3d 901, 392 N.E.2d 126 (1979), held that a radiologist could not be ordered reinstated against the employer's wishes:
 When a contract call for services over a period of time, especially when such services require special skill, knowledge, and judgment or discretion, it would be impractical, if not impossible, for a court to provide the continuous supervision necessary to enforce this kind of order for specific performance. . .In addition, personal service contracts often require a relationship of cooperation and trust between the parties to the contract. Consequently, as a matter of public policy courts will avoid the friction that would be caused by compelling an employer to hire or retain someone against their wishes.
Accord Witt v. Forest Hospital, Inc., 115 Ill. App.3d 481,450 N.E.2d 811 (1983) (nurse); Kurle v. Evangelical Hospital Assoc.,89 Ill. App.3d 45, 411 N.E.2d 326 (1980) (id.); Straus v. North Hollywood Hospital, Inc., 150 Cal.App.2d 306, 309 P.2d 541 (1957) (pathologist); Woolley v. Embassy Suites, Inc., 227 Cal.App.3d 1520,278 Cal.Rptr. 719 (1991) (hotel managers); Felch v. Findlay College,119 Ohio App. 357, 200 N.E.2d 353 (1963) (college faculty member); Smith v. Dluhos, Slip Op. (N.D.Ill. August 16, 1983) (police officer); Podlesnick v. Airborne Express, Inc., 627 F. Sup. 1113
(S.D.Ohio 1986), aff'd without op 836 F.2d 550 (6th Cir. 1987) (airline pilot); Heheman v. E.W. Scripps Co., 661 F.2d 1115 (6th Cir. 1981), cert. denied 456 U.S. 991 (1982) (printers); Redgrave v. Boston Symphony Orchestra, 557 F. Sup. 230 (D.Mass. 1983) (celebrity narrator of concert series). As the Court observed in Woolley v. Embassy Suites, supra, 227 Cal.App.3d at 1534:
 "[The plaintiff's] services, even by [the plaintiff's] own judgment, are wide ranging and involve daily discretionary activities. . .In other words, the contracts call for a series of complex and delicate business decisions and require mutual cooperation and trust, both of which have ceased to CT Page 1561 exist in the wake of rancorous litigation between the parties.
The foregoing principles are plainly applicable here — it would be highly inappropriate and untenable to force Hall-Brooke and its Trustees to re-hire Solomon in any of her capacities, particularly given the history of difficulties between the parties, including the "rancorous litigation" which has dominated the parties' relationship for the past 11 years.
"[T]he decision to award a remedy of rescission for breach of contract always depends upon a showing of what justice requires in the particular circumstances and this necessarily rests in the discretion of the trial Court." Burt's Spirit Shop, Inc. v. Ridgeway,215 Conn. 355, 361 (1990). Here, Hall-Brooke has operated as a non-profit charitable institution for 25 years. It has solicited and received charitable donations, and has enjoyed other benefits of non-profit status, such as affiliations with various agencies and grants from various public entities, which by Solomon's own testimony would likely not have happened were Hall-Brooke a private for-profit hospital. The return of "I.H.C. corporation" to Solomon could immediately deprive Hall-Brooke of these many advantages of non-profit status. Additionally, this result might well be applied retroactively for income tax purposes, resulting in an adverse financial impact on some or all of the persons who since 1966 have made charitable donations to Hall-Brooke — not to mention potentially harsh adverse tax consequences to Hall-Brooke, which has operated tax-free for the past 25 years. Treas. Reg. 601.201(n)(6)(i). There is no factual, legal, or equitable justification for any of this. To the contrary, the injunctive relief that Solomon seeks would be far more harmful to the public than any alleged injury to Solomon, and hence it is denied. Anderson v. Latimer Point Magmt. Corp., supra,208 Conn. at 318.
B. THE MISMANAGEMENT CASE, NO. 83-229056
In this action, Solomon claims that Hall-Brooke has been mismanaged and its assets misused. In essence, she complains that Hall-Brooke's Trustees have acted "ultra vires." In addition to seeking the same injunctive relief as is sought in the "reinstatement/rescission" case, Solomon seeks injunctive relief compelling the Foundation to account for "official misconduct" and to seek reimbursement of the funds "dissipated" and "diverted" by the individual defendants.[23] While the Court finds no merit to Solomon's claims, Solomon in any event has no standing to make them.
A proceeding complaining "ultra vires" acts may be brought by a "member or a director" of a corporation. C.G.S. 33-439(1). Solomon is neither. She is obviously no longer a director (or trustee). Nor is she a "member" — a concept defined by statute CT Page 1562 as one having "membership rights in a corporation in accordance with the provision of its certificate of incorporation or bylaws". C.G.S. 33-431(j). By statute, a corporation may or may not have members, and if it has no members it shall operate under the management of its board of directors. C.G.S. 33-458. Since its inception, Hall-Brooke's charter has provided that Hall-Brooke "shall have no members" and instead "shall" be operated under the management and control of its Trustees. [Ex. 12, 112, 388.] Therefore, neither Solomon — nor for that matter anyone else — can claim to be a "member" of Hall-Brooke.
Nor is there anything which renders this case unique, despite Solomon's claim in this and other actions that she was entitled to be reinstated to Hall-Brooke' board. If Solomon had standing because of that claim, then arguably every disgruntled, terminated director — indeed, perhaps every terminated manager — could sue not only for damages for breach of contract, wrongful discharge and reinstatement, but also for an injunction complaining about everything the corporate entity did after the director's termination. There is no justification for expanding the principles of standing in this way. To the contrary, as one who is neither a director nor a member of a Connecticut corporation, if Solomon suspected impropriety, she was not without a remedy. The Attorney General is specifically authorized to commence a proceeding under C.G.S. 33-429(3) to enjoin the corporation from the conduct of unauthorized affairs. See also C.G.S. 3-125, which charges the Attorney General with protecting the public interest in respect of charitable foundations. In fact, in this case, Solomon did sue the Attorney General to compel him to pursue her complaints against Hall-Brooke, implicitly conceding that this was his function. [See initial complaint in this action.] Although for reasons of her own Solomon dropped that claim at the commencement of this jury trial, there is no justification for this Court's substitution of Solomon in the role of the Attorney General.
The Connecticut Supreme Court has frequently reiterated that a person must have standing in order to prosecute an action:
 [W]e have long recognized that a person is not "entitled to set the machinery of the courts in operation except to obtain redress for an injury. . .he may suffer, either in an individual or a representative capacity.
Alarm Applications Co., Inc. v. Simsbury Volunteer Fire Co. Inc.,179 Conn. 541, 546 (1980), quoting Bassett v. Desmond, 140 Conn. 426, 430
(1953). The injury-in-fact requirement is important "for it is this requirement that gives a litigant a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders." Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483, 494 (1978). CT Page 1563
Solomon is, at best, a "concerned bystander." She has not suffered any injury sufficient to give her standing to bring this action, and therefore the Court need not proceed further. Nevertheless, in order to provide any Appellate Court with the benefit of the trial Court's assessment of over four months of evidence, the Court holds that in any event here again the evidence consisted of no more than Solomon's disagreement with judgments made by current management. There was no evidence of any mismanagement, misfeasance, or misuse of funds by either Hall-Brooke or any individuals associated with Hall-Brooke.
C. THE LEASE CASE. NO. 83-229036
As noted above, this case distills to Solomon's claim that she is entitled to additional rent on account of the School built in 1975. Solomon's claim is that 28.02 of the 1969 lease, which provides for increased rent payments on account of "enlargement or substantial alteration" of the premises, entitles her to $40,700 in increased rent annually on account of the School. [Complaint No. 83-68265, Second Count 10.] She claims there was an agreement to defer the rent payments until the School was in the "black". Hall-Brooke, on the other hand, contends that the 1969 lease specifically contemplated and included increased rental payments in anticipation of future construction of buildings to be used for a "Children's Residential Treatment Center" (the "Children's Complex") and that the School, which was built some six years after the lease was revised, is a portion of the Children's Complex whose rent was already included in the rent payments since 1969.
The Court's analysis commences with several elementary principles of lease interpretation:
 A lease is a contract. In its construction, three elementary principles must be kept constantly in mind: (1) the intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible. . .
* * *
 In determining the meaning and effect of the controverted language in the lease, the inquiry must focus on the intention expressed in the lease and not on what intention existed in the mind of the parties. . . CT Page 1564
Hatcho Corp. v. Della Pietra, 195 Conn. 18, 20 (1985) and cases cited; Robinson v. Weitz, 171 Conn. 545, 551 (1976). However, where there is an ambiguity, extrinsic evidence may be relied upon in determining the intent of the parties. See Restatement, 2nd, Contracts, 270 et seq. Applying these principles, the Court concludes that Solomon is entitled to additional rent.
We turn first to the lease, which includes the following pertinent provisions:
a. The "Whereas" Clauses
"Whereas the Tenant has proposed to erect upon said premises a project known as `Children's Residential Treatment Center Complex', and
Whereas the Tenant has requested permission to construct said Complex and has requested a long term lease for said premises, and
Whereas the Landlord desires to cooperate in all respects to facilitate the Tenant's purposes, and
Whereas the Landlord is willing to enter into this renegotiated lease in reliance upon the Tenant's proposed future use of the property,
NOW THEREFORE in consideration of the mutual agreements herein contained and as set forth above, the parties hereto covenant to and with each other as follows. . ."
b. The "New Construction" Clause
Section 27.01. Landlord hereby grants Tenant permission to construct the Children's Residential Treatment Center Complex on the premises, the plans and exact location of which shall be first approved by the Landlord. The amount of land anticipated for said Complex is approximately five (5) acres and has a present anticipated cost of $3,500,000.00 to $5,000,000.00. Any or all of said Complex may be commenced at any time after the date hereof.
c. The "Enlargement" Clause
"In the event enlargement or substantial alteration of the present facilities becomes necessary all plans and projections must first be submitted to Landlord for approval and consent, which approval and consent will not be unreasonably withheld. . .provided. . .that the rental payments shall be adjusted to reflect the fair value of the land and other use of the facilities brought about by said enlargement or substantial alteration of the facilities." [Art. 28, 28.02.]
It is immediately apparent that the lease does not by its CT Page 1565 terms indicate what buildings or types of buildings the Children's Complex was to include. Nor does the lease by its terms state whether the rent for the Children's Complex was already included in the base or "net rent" [Art. 2] or whether, as Solomon contends, the rent was to be increased upon construction of the Children's Complex under the "Enlargement" clause (Art. 28). To this extent, therefore, the lease is ambiguous, and therefore extrinsic evidence is admissible and so may be relied upon in resolving what was meant. Cody v. Remington Electric Shavers, 179 Conn. 494 (1980).
The Defendant has argued that Solomon herself has essentially conceded that no additional rent for the School is due under the lease. These concessions include Solomon's unequivocal sworn testimony before the CHHC (Exs. 614b; 623b), her silence in the face of the Trustees' tape recorded statements that no additional rent was due for the School (Ex. 616a), and her apparent approval of her auditors' rent projections which do not include any additional rent for the School (Ex. 1003). On the other hand there are certain more direct and compelling "admissions by conduct" that can be attributed to the defendant. The appraisal submitted by Brennan Brennan to the Board of Trustees on January 17, 1975, very explicitly states that the "subject property is being leased at a sum of $192,500.00[24] not including the new school facility." (Ex. 56, on p. 72) Emphasis added. A separate and additional figure of $40,700.00 was assigned to the school. This appraisal was requested by the Board of Trustees. There was no evidence offered by the defendant to contradict this statement; in fact, there was a follow up letter dated January 20, 1975 by the appraisers to the Board, at Professor Barone's request, which provided "a separate Valuation Summary of the school building constructed in 1974 with the estimated rental for it." (See insert to Ex. 56) Again, this was requested by the board of trustees, accepted by it and no contradiction was offered when the appraisers set forth the same figures previously given. Indeed, the appraisal (Ex. 56) was specifically reviewed at the January 30, 1975 Board Meeting. (See Ex. 442 — Minutes submitted by Kirsten T. Lawrence, Assistant Secretary.) At the meeting, the figures, and most specifically the exclusion of the school, were noted. The members questioned whether the lease terms (none specified) were favorable and it was agreed that opinions would be elicited from Attorneys Boyd and Curran. (Id. at p. 2.) It was in response to a request from Leo Schnitzer, Board Chairman, asking him to review the lease that in early March, 1975, Attorney Boyd wrote back endorsing its fairness and providing an explanation for its length of term. (Ex. 596) Boyd was the one to represent the foundation when the 1969 lease was drafted, approved and signed.
The tape of the November 25, 1974 board meeting to which the defendant refers (Ex. 616a, tape 2 side 1) preceeded this Brennan 
Brennan appraisal. At that meeting the board was eager to know that its then current rent was fair, but more importantly, that it could get a mortgage on leasehold improvements. Although there is a CT Page 1566 statement from an unknown male voice that the school did not affect the rent, to which Solomon apparently sat silent, Solomon sat silent throughout that entire discussion because of her obvious conflict of interest. She did the same until the very end of the board meeting of March 12, 1975 when the foundation's ability to build further was of concern.[25] (Ex. 618a) Therefore, this Court is adverse to finding her silence to be of any evidential value. And finally, any impression that the school's rent was already covered by Art. 2, as reflected by the statement by the male voice at the November 25, 1974 board meeting to which the defendant refers, was certainly clearly corrected by the January 17, 1975 appraisal and January 20, 1975 addendum. No confusion by board members on that issue was expressed thereafter.[26]
Additional evidence of note is the March 4, 1980 appraisal sent to Rosalie Aberman, Executive Director of Hall-Brooke which sets the fair rental value of the property at $265,400.00, and the fair market value of the property at $2,654,000.00. (Ex. 220) The appraiser explicitly states that the school building was not included as an improvement for appraisal purposes (Id. at 4.) That rental figure, exclusive of the school, was considerably more than the foundation was paying Solomon pursuant to Art. 2 of the lease for what the defendant asserts was all of Hall-Brooke's land and improvements.
Perhaps the most compelling or "presumptive evidence" in support of the Plaintiff's position is that the tenant paid $65,000.00 from 1969-1975, before the school was finally built. As Ex. 598 (letter from Attorney John R. Curran) states, both "Messrs. Koizim and Benedict are members of the Board of Trustees (and) [t]hey are both extremely competent real estate lawyers." Certainly, they, or anyone else on the board, including Dr. Barone who elicited the appraisal and Mr. Curran's opinion, were free to question why the institution was paying $65,000.00 per year, the chief consideration for which, according to the defendant, was a building not yet in existence. Nearly six years passed between the 1969 lease and the 1975 completion of the building within which to address this question. While the lease clearly contemplated the children's complex, no date was set for construction to commence.[27] And as Plaintiff's Ex. 48 shows, it was not until March 1, 1974 that the acting commissioner of education wrote to Hall-Brooke Foundation agreeing that if plans for a new school were submitted, he would conditionally restore approval for the school which had been recently lost due to overcrowding of the old facility. Money was only secured ($240,000.00 to be exact) in 1974 (Ex. 596) and plans were approved by the zoning authorities in January 1974 (Ex. 423).
All of the aforementioned admissions, testimony and behavior are proper for consideration by the Court in interpreting the lease ambiguity.[28] As one of the leading commentators on lease law has written (relying for support upon the United States Supreme Court): CT Page 1567
 One of the tools by which agreements are construed is practical interpretation or practical construction. This doctrine applies to ambiguous language and construes such language in the light of what the parties have done thereunder. . . . [I]t is assumed that self-interest prompts a party to proceed to his advantage. It has been said
 "The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant, than to see what they have done. Self-interest stimulates the mind to activity, and sharpens its perspicacity. Parties in such cases often claim more, but rarely less, than they are entitled to. The probabilities are largely in the direction of the former. . ."
2 Friedman on Leases (2nd Ed. 1983) 26.502, citing Insurance Co. v. Dutcher, 95 U.S. 269, 273 (1877). Accord W.G. Maltby, Inc. v. Associated Realty Co., 114 Conn. 283, 289-90 (1932) (evidence of practical construction of lease is strong presumptive evidence of the parties' intention as to the lease construction).
Finally, despite the defendant's argument to the contrary, this Court finds that under the plaintiff's theory Art. 27 clearly had a purpose — to reflect approval by the landlord for construction of the Children's Complex. This was part of the consideration for the $65,000.00, along with the long term nature of the lease. (See p. 1 of Ex. 38). Art. 28 required all plans and projections for proposed enlargements and alterations to be submitted to the landlord for her approval and consent, subject to various conditions. It further provided for increased rental payments to reflect the value of the additions. The defendant has argued that the plaintiff's position renders Art. 27 meaningless. This is a view of the provisions that is too singular in approach. Although she claims the additional rent comes from Art. 28, Art. 27, while it fails to provide for the specific rent increase, does address the question of prior approval. It mirrors the clause of the lease in the very beginning which set out the reasons for its creation. Indeed, this very same prior approval was, to a great extent, the consideration for the lease. No rent figure was specifically set out in Art. 27, or anywhere else but that makes a great deal of sense — particularly in light of the lack of specifics as to when construction was to commence.
The defendant has never argued that any enlargement (other than the school complex) was not covered by Art. 28. How exactly the rent was to be adjusted to reflect the fair value of the land was not spelled out; however, fair value of land is an issue generally ascertained by appraisers. Both the course of performance (as evidenced by Ex. 56) and the course of dealing and usage of the trade CT Page 1568 would support the use of an independent appraiser to ascertain value and accordingly the rent to be assigned to the school. Therefore, the figure set by Brennan Brennan, commissioned by the defendant, is a reasonable one upon which the plaintiff may fairly rely.
There remains the issue of Solomon's testimony, that she agreed to wait for the school to be in the black before collecting the increase in rent. (Tr. pp. 1223-25) The evidence shows that Solomon made no demand for the rent until after her termination. The defendant does not argue the issues of waiver, estoppel or laches in its brief. The special defenses, filed on September 21, 1984 allege waiver by acceptance of the rent for six years without demand for the additional money, estoppel because it relied on her statements and actions that she would not seek additional rent, and laches; there is a further special defense that in the event the lease is read as claimed by Solomon, the parties orally modified the lease. (Defendant's Answer Special Defenses, First, Fourth, Fifth, Sixth Special Defenses.)
Clearly, the burden of proof by a preponderance of the evidence as to estoppel, laches and waiver is on the pleader. A. Sangivanni Sons. v. F. M. Floryant Co., 158 Conn. 467, 476
(1969). Where such essential proof has not been produced, this Court cannot provide protection by virtue of such equitable doctrines. In the absence of proof of prejudice by the defendant, which is an essential element of laches, this Court is unable to find that that special defense has been substantiated. See Berin v. Olson, 183 Conn. 337,344-45 (1981). (Although defendant's activities commenced in 1970, complaint was filed in 1973 and trial occurred approximately nine years after activities in issue, "nothing to show that the plaintiff took any action which was inexcusable or prejudicial to the defendant so as to justify a conclusion of laches.")
 "We have continually held that laches consists of two elements. `"First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant." Kurzatkowski v. Kurzatkowski, 142 Conn. 680, 685, 116 A.2d 906 (1955); Kievman v. Grevers, 122 Conn. 406, 411, 189 A. 609 (1937); 27 Am.Jur.2d, Equity 152. The mere lapse of time does not constitute laches; Finucane v. Hayden, 86 Idaho 199, 206, 384 P.2d 236 (1963); 27 Am.Jur.2d, Equity 163; unless it results in prejudice to the defendant; see Leary v. Stylarama of New Haven, Inc., 174 Conn. 217, 219, 384 A.2d 377 (1978); Bianco v. Darien, 157 Conn. 548, 556, 254 A.2d 898 (1969). . . .' Bozzi v. Bozzi, 177 Conn. 232, 239, 413 A.2d 834 (1979). `Laches in legal significance is not mere delay, but delay that works a disadvantage to another.' 1 Pomeroy, Equity Jurisprudence (5th Ed. Symonds) 419d. `A conclusion that. . .[a party] has been guilty of laches is one of fact for the trier and not CT Page 1569 one that can be made by this court, unless the subordinate facts sound make such a conclusion inevitable as a matter of law.' Kurzatkowski v. Kurzatkowski, supra, 684."
Id. at 344-45; see also Papcun v. Papcun, 181 Conn. 618, 620-21
(1980). No proof exists that Hall-Brooke Foundation did not have all the information, records etc. available to it as relates to the lease case, or any of the other matters before the Court, and no evidence was offered that this suit would in any way have been accelerated had the plaintiff made her demand/claim more explicit sooner. Powel v. Bulce, 178 Conn. 384, 392-93 (1979).
The defendant also attempts to invoke the doctrine of equitable estoppel:
 "`There are two essential elements to an estoppel — the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done.'"
Spear-Newman, Inc. v. Modern Floor Corporation, 149 Conn. 88, 91,175 A.2d 565 (1961). There is no evidence that the defendant changed its position in reliance on the plaintiff's nonenforcement of Art. 28 as it relates to the school. In the absence of prejudice, estoppel does not exist. And finally, "there is nothing in the record to indicate that the defendant did some act to its injury which it otherwise would not have done, which act was induced by any representations by the plaintiff." Papcun v. Papcun, Supra at 621.
On the issue of waiver, this Court finds Solomon's testimony regarding her decision to wait for the school to "break even" before getting the rent to be credible. She testified that she was waiting for the school to break even and she did so willingly. (Tr. pp. 1223-1225). Waiver is the intentional relinquishment of a known right. Goldenberg v. Corp. Air, Inc., 189 504, 510 (1983). It is a question of fact, and it may be express or implied. There is no evidence to support and no reason to believe that Solomon suspected the board of any intent to defraud her permanently of the added rent; therefore, she had no reason to assume that when she offered to temporarily forego collection of the rent it would be deemed a waiver of her right forever.
And finally, there was no evidence produced to substantiate the defendant's position that "to the extent the lease provided for an adjustment of rental payments as a result of the construction of the school building, the lease was orally modified by the parties to eliminate that provision." In addition to the fact that no one testified regarding any such modification, no allegations of CT Page 1570 consideration in support of such modification were made. No evidence of mutual assent by the parties to such perported modification was proffered. See First Hartford Realty Co. v. Ellis, 181 Conn. 25, 33
(1980). (wherein Court repeated well established rule that: "[i]n order to prove that a contract has been modified, the party asserting the modification must show mutual assent to its meaning and conditions. Lar-Rob Bus Corporation v. Fairfield, 170 Conn. 397,402, 365 A.2d 1086 (1976); Hess v. Dumouchel Paper Co., 154 Conn. 343,347, 225 A.2d 797 (1966)). Moreover, such modifications, if any, should have been made in writing to have any force and effect. (Ex. 38, Art. 29.01).
In conclusion, Solomon is entitled to the rent in connection with the school. Although she now claims entitlement from May 11, 1975, this Court does view her conduct in agreeing to forego the rent until the school became profitable, obviously while still the foundations executive director, as a waiver of that money. She did not testify that she would expect back rent when it came time for her to inforce the lease. The Court views her testimony as an offer to forego it until the school could afford to pay her. Although she did not anticipate being fired in 1980, when she made the offer during her tenure from 1975-1980, it was to allow the school to get a firm footing. The plaintiff seeks rent from March 1975 through today. However, the first demand for the school rent, according to the evidence and pleadings, came after Solomon's termination. The Second Count of the complaint does not specify the date upon which demand was made.[29] The defendants contend it was only after she was fired that she did so and the plaintiff had produced no evidence as to the date of demand — presumably because she believes rent is due and owing from the day the building was opened. The Court finds that Solomon's offer to forego the rent constitutes a waiver solely for the time period covered by the offer.[30] Solomon testified that her attempted return to Hall-Brooke on February 17, 1982 was deliberately planned for that day because the original two year leave of absence would have expired then. Therefore, it is reasonable to infer that at the point in time she was escorted off the premises and was unable to resume her prior role as planned, her offer to forego the added rent was withdrawn. This thwarted coup attempt was certainly an unequivocal act by Solomon showing an exercise of all rights she claimed.[31] That date therefore serves as the date from which rent due and owing should be calculated.
Therefore back rent of $40,700.00 per year from February 17, 1982 to the date of this decision is owed. Ten years of back rent means $407,000.00 due Solomon. Finally, the plaintiff has requested interest pursuant to Conn. Gen. Stats. 37-3 a. At 10% per year, this Court calculates interest in the amount of $223,850.00.[32]
KATZ, J.
[EDITORS' NOTE: THE CASE THAT PREVIOUSLY APPEARED ON THIS PAGE HAS BEEN MOVED TO CONN. SUP. PUBLISHED OPINIONS.] CT Page 1579